## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Nora* and her minor son, Jose* (by and through his mother),<br>c/o American Civil Liberties Union<br>125 Broad Street, 18th Floor<br>New York, NY 10004 | )<br>)<br>)<br>)<br>) |
| | ) |
| Jonathan* and his minor son, Steven* (by and through his father),<br>c/o American Civil Liberties Union<br>125 Broad Street, 18th Floor<br>New York, NY 10004 | )<br>)<br>)<br>)<br>)<br>) |
| Emilia* and her minor daughters, Gabriela* and Jane* (by and through their mother),<br>c/o American Civil Liberties Union<br>125 Broad Street, 18th Floor<br>New York, NY 10004 | )<br>)<br>)<br>)<br>)<br>) |
| Fabiola*,<br>c/o American Civil Liberties Union<br>125 Broad Street, 18th Floor<br>New York, NY 10004 | )<br>)<br>)<br>)<br>) |
| Ernesto*,<br>c/o American Civil Liberties Union<br>125 Broad Street, 18th Floor<br>New York, NY 10004 | )<br>)<br>)<br>)<br>) |
| Laura*, her husband Joseph* and their minor children, Anna* and Carlos* (by and through their mother),<br>c/o American Civil Liberties Union<br>125 Broad Street, 18th Floor<br>New York, NY 10004 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Diana* and her minor children, Wanda* and Diego* (by and through their mother),<br>c/o American Civil Liberties Union<br>125 Broad Street, 18th Floor<br>New York, NY 10004 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case: 1:20−cv−00993
Assigned To : Jackson, Amy Berman
Assign. Date : 4/16/2020
Description: Gen. Civil (E−DECK)

No. 2020-cv-_____

**RECEIVED**

APR 14 2020

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

Jessica* and her minor children, Edgar* and Damian*          )
(by and through their mother),                               )
c/o American Civil Liberties Union                           )
125 Broad Street, 18th Floor                                 )
New York, NY 10004                                           )
                                                             )
Henry* and his minor daughter Carolina*                      )
(by and through their mother)                                )
c/o American Civil Liberties Union                           )
125 Broad Street, 18th Floor                                 )
New York, NY 10004                                           )
                                                             )
Armando* and his minor son Salvador* (by and                 )
through his father)                                          )
c/o American Civil Liberties Union                           )
125 Broad Street, 18th Floor                                 )
New York, NY 10004                                           )
                                                             )
Carmen* and her minor children Lola* and Esteban*            )
(by and through their mother)                                )
c/o American Civil Liberties Union                           )
125 Broad Street, 18th Floor                                 )
New York, NY 10004                                           )
                                                             )
*Plaintiffs*,                                                )
                                                             )
v.                                                           )
                                                             )
CHAD F. WOLF, Acting Secretary of the                        )
Department of Homeland Security, in his official             )
capacity,                                                    )
245 Murray Lane, SW,                                         )
Washington, DC 20528;                                        )
                                                             )
U.S. DEPARTMENT OF HOMELAND SECURITY,                        )
245 Murray Lane, SW,                                         )
Washington, DC 20528;                                        )
                                                             )
*Defendants*.                                                )
                                                             )

## COMPLAINT FOR INJUCTIVE AND DECLARATORY RELIEF

*Plaintiffs proceeding under a pseudonym are marked with an asterisk.

## INTRODUCTION

1.      This is a lawsuit by 26 asylum seekers—12 adults and their 14 minor children—who are unlawfully trapped in life-threatening conditions in Mexico, while they wait for their asylum proceedings in the United States to conclude. Plaintiffs all fled violence and persecution in their home countries and sought refuge in the United States. But the Department of Homeland Security ("DHS") sent them back across the border to the notoriously dangerous Mexican border state of Tamaulipas and has forced them to remain there while their removal proceedings are pending.

2.      Plaintiffs have endured—and continue to endure—unspeakable horrors in Tamaulipas. They have been assaulted, kidnapped, and raped by members of organized groups that control Tamaulipas and act with impunity. Plaintiffs live in constant fear of additional such attacks, afraid to go out except when absolutely necessary.

3.      Plaintiffs were returned to Mexico pursuant to DHS's so-called Migrant Protection Protocols ("MPP"), protocols first implemented in late January 2019. Although MPP was recently held illegal by the Court of Appeals for the Ninth Circuit, the injunction against MPP has been stayed by the Supreme Court pending a petition for certiorari.

4.       Under MPP, DHS returns to Mexico certain non-Mexican asylum seekers who arrive at the United States' southern border and does not permit them to remain in the United States, pending adjudication of their immigration cases.

5.      In July 2019, DHS expanded MPP to the Mexican border state of Tamaulipas, sending individuals from the United States back to Tamaulipas ("MPP-Tamaulipas"), notwithstanding widespread recognition, including by the U.S. Department of State, of the extreme violence that migrants face there.

6.      Under MPP-Tamaulipas, DHS returns to Tamaulipas certain individuals who present themselves at ports of entry in Texas, including Laredo, McAllen, and Brownsville—as well as individuals who enter without inspection near these ports. DHS requires these individuals to remain in Mexico pending their removal hearings, which are scheduled in U.S. immigration courts at the ports of entry in Laredo or Brownsville, Texas. In order to gain entry to the U.S. for their hearings, they must show up on the bridges that connect the Mexican cities of Nuevo Laredo and Matamoros, Tamaulipas, with Laredo and Brownsville respectively. If they fail to show up for their hearings, they are ordered removed.

7.      When DHS first announced MPP in December 2018, it claimed that these protocols were intended to deter fraudulent asylum seekers seeking to "game the system," but would: (1) ensure that "[v]ulnerable populations will get the protection they need" while waiting in Mexico; (2) "strengthen our humanitarian commitments" to "legitimate asylum-seekers"; and, (3) comply "with all domestic and international legal obligations," most significantly the prohibition on returning people to places where they are likely to face persecution or torture.[1] But DHS's decision to expand MPP to Tamaulipas—a region that has been under a State Department "Do Not Travel" Advisory since at least 2018, and that is known as one of the most violent and lawless regions in the world—affirmatively places returned asylum seekers, like the 26 plaintiffs, in immediate and continuing danger, and returns them to extreme harm, including persecution and torture. Thus, quite apart from the illegality of MPP itself, Defendants' decision to expand

---

[1] Press Release, U.S. Dep't of Homeland Sec., Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration (Dec. 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

MPP to Tamaulipas was unlawful, including because Defendants failed to consider the dangerous conditions in Tamaulipas.

8.      For similar reasons, Defendants' return of each of the Plaintiffs to Tamaulipas violates their due process right to be free from state-created danger. Defendants knew or should have known of the extraordinary dangers facing people they returned to Tamaulipas, and were—at a minimum—deliberately indifferent to the shocking dangers Plaintiffs faced.

9.      Moreover, Defendants violated and are continuing to violate their own nonrefoulement obligations and the rules of MPP by failing to follow mandatory procedures for nonrefoulement interviews and by returning the Plaintiffs to Tamaulipas when no reasonable fact finder, applying the correct standards, could have found that they failed to establish a likelihood of persecution or torture there. For example, Defendants returned Plaintiff Nora and her three-year-old son to Tamaulipas even after she described how, in Tamaulipas, she was repeatedly raped her in front of her son, and her rapists threatened to kill him if she resisted. Plaintiff Jonathan and his young son were returned to Tamaulipas notwithstanding Jonathan's brutal torture in Tamaulipas by cartel members.[2]

10.     The horrific abuse Plaintiffs have experienced has left them with physical and psychological scars which, according to experts on medical and psychological trauma, will permanently impair their health and ability to function. In particular, the 14 minor plaintiffs— nine of whom are age six or younger—face long-lasting impact and neurological harm from undergoing and witnessing distressing events such as kidnapping, gang rape, physical assault,

---

[2] Plaintiffs' persecutors come from a range of cartels and gangs who act with full impunity and, often, in tandem with Mexican authorities in Tamaulipas. Plaintiffs' claims are united by the brutality of the harms, the Mexican government's inability and/or unwillingness to protect them from these actors, and Defendants' notice of this situation.

and torture inflicted on their parents. Some have shut down emotionally. All are living in a state of terror and, like their parents, cannot recover from the trauma they experienced in Mexico so long as they remain there. Only through mental health counseling and treatment is there the possibility of ameliorating these effects. Any recovery process, however, cannot even begin until Plaintiffs are transferred out of Mexico to a safe environment.

11.     Plaintiffs seek a declaration that Defendants acted unlawfully under the Administrative Procedure Act ("APA") and violated their rights under the Due Process Clause of the U.S. Constitution by returning them to Tamaulipas pending their removal proceedings. They also seek a declaration that Defendants acted unlawfully by expanding MPP to Tamaulipas. They ask this Court to set aside MPP-Tamaulipas and the decisions to return each of them to Mexico, and to order DHS to remove each of them from MPP and to allow them to return immediately to the United States—with appropriate precautionary public health measures—to pursue their asylum proceedings from inside the United States.

## JURISDICTION AND VENUE

12.     This case arises under the United States Constitution; the APA, 5 U.S.C. § 701 *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.* and its implementing regulations; the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027, and the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681–822 (1998) (codified at 8 U.S.C. § 1231 note).

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).

14.     Venue is proper under 28 U.S.C. § 1391(e) because all Defendants reside in this District and a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES[3]

### Plaintiffs

15.     **Plaintiff Nora and her son Jose, age three,** are asylum seekers from El Salvador. Pursuant to MPP-Tamaulipas they have been stranded in Tamaulipas since August 2019, while they wait for their asylum proceedings to conclude. After they were returned to Tamaulipas, Nora and her son were kidnapped by cartel members who repeatedly gang raped her in front of her son. Nora told U.S. immigration officials what happened and pleaded with them not to return them to Mexico. They remain in hiding, awaiting their next immigration hearing—recently rescheduled for early May—in fear for their lives.[4]

16.     **Plaintiff Jonathan and his son Steven, age three,** are asylum seekers from Honduras. Pursuant to MPP-Tamaulipas, they have been stranded in Tamaulipas since August 2019 while

---

[3] Plaintiffs are proceeding under pseudonyms and have filed their full declarations under seal because of the danger they would face in Mexico and their home countries should their identities be made public. Moreover, additional facts about their experiences as well as information about their places of hiding are also filed under seal for their safety. Plaintiffs therefore respectfully refer the Court to their sealed declarations and to-be-filed-under-seal psychological evaluations for further details.

[4] Due to the coronavirus pandemic, non-detained immigration court hearings—including those under MPP—have been suspended through May 1, 2020. *See* Executive Office for Immigration Review, *EOIR Operational Status During Coronavirus Pandemic*, U.S. Dep't of Justice, https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic_(last visited Apr. 9, 2020). Accordingly, Nora's hearing date—and the hearing dates of most Plaintiffs—are also likely to be postponed for the foreseeable future. For example, Laura's hearing has already been postponed from mid-April to mid-July. Carmen's has been postponed until August. Despite these postponements, Plaintiffs have still been required to present at ports of entry on the days of their hearings to obtain a continuance and permission from Mexican immigration authorities to remain in Mexico while their MPP proceedings are pending.

they wait for their asylum proceedings to conclude. After being returned to Tamaulipas, Jonathan

and his son were kidnapped by cartel members, who brutally assaulted Jonathan, and extorted his

family in the United States, while threatening to kill him and his son. Jonathan told U.S.

immigration officials what happened and pleaded with them not to be sent back. He and his son

remain in hiding, awaiting their next hearing, in fear for their lives.

17.     **Plaintiff Emilia and her daughters Gabriela, age 16, and Jane, age 10,** are asylum

seekers from Honduras. Pursuant to MPP-Tamaulipas they have been stranded in Tamaulipas

since August 2019, while they wait for their asylum proceedings to conclude. After being

returned to Tamaulipas, Emilia and her daughters were kidnapped by cartel members, who gang

raped Emilia and her eldest daughter over a period of days. Although the family attempted to

relocate to find safety, their attackers found them and kidnapped and raped Emilia and her

daughter again. Emilia told U.S. immigration officials what happened and pleaded with them not

to send her and her daughters back. The family remains in hiding, awaiting their next hearing, in

fear for their lives.

18.     **Plaintiff Fabiola** is an asylum seeker from Guatemala. Pursuant to MPP-Tamaulipas, she

has been stranded in Tamaulipas since October 2019, while she waits for her asylum proceedings

to conclude. Prior to crossing the border into the United States with her two young children, ages

six and eight, the family was kidnapped in Tamaulipas, starved, and threatened with death.

Fabiola told immigration officers she was afraid to go back to Mexico, but the family was

returned there. In December 2019, following two attempted kidnappings and an attempted sexual

assault, Fabiola made the difficult decision to send her children across the border by themselves.

Fabiola has since continued to plead with U.S. immigration officials to allow her to remain in the

United States pending her removal proceedings. She remains at a migrant encampment in

Matamoros, Tamaulipas, awaiting her next hearing, in fear for her life as well as permanent separation from her children.

19.     **Plaintiff Ernesto** is a gay asylum seeker from Guatemala. Pursuant to MPP-Tamaulipas, he has been stranded in Tamaulipas since July 2019. In Tamaulipas, Ernesto was assaulted by cartel members at the bus station in Nuevo Laredo Tamaulipas, almost immediately after he was returned there by U.S. immigration agents. Since then cartel members have assaulted and extorted him on a regular basis, forcing their way into his residence in Tamaulipas, sometimes at gunpoint. Ernesto has described his treatment to U.S. officials and asked not to be sent back. He remains in hiding in Matamoros, Tamaulipas, awaiting his next hearing, in fear for his life.

20.     **Plaintiff Laura, her husband Joseph, daughter Anna, age six, and son Carlos, age four,** are asylum seekers from Guatemala. Pursuant to MPP-Tamaulipas they have been stranded in Tamaulipas since July 2019. In Tamaulipas, prior to crossing the border into the United States to seek asylum, a local cartel kidnapped the family, imprisoned them with other migrants, beat Joseph with a wooden plank, and threatened to kill the family if they ever left Nuevo Laredo, Tamaulipas, without paying the cartel. Laura told U.S. immigration officials about the kidnapping and death threats. But the family was sent back. The family remains in hiding in Nuevo Laredo, awaiting their next hearing, in fear for their lives.

21.     **Plaintiff Diana, her daughter Wanda, age 17, and son Diego, age six,** are asylum seekers from Honduras. Pursuant to MPP-Tamaulipas, they have been stranded in Tamaulipas since December 2019. Prior to crossing into the United States to seek asylum, the family was attacked and robbed by armed gang members in Mexico and Wanda was separated from the group and gang raped. Diana told U.S. immigration officers the family was afraid to return to Mexico, but they were sent back. Shortly thereafter, Wanda was nearly kidnapped and raped

again when she attempted to use a restroom at a migrant encampment in Matamoros, Tamaulipas. With no other options, the family remains at the encampment, awaiting their next hearing, in fear for their lives.

22. **Plaintiff Jessica and her sons Edgar, age 16, and Damian, age six,** are asylum seekers from Honduras. Pursuant to MPP-Tamaulipas, they have been stranded in Tamaulipas since August 2019. While traveling to the United States through Tamaulipas, Jessica and her sons were kidnapped, starved and abused for more than a month. The family has been living in a migrant encampment in Matamoros, Tamaulipas, where they face constant threat of assault, kidnapping and rape by cartel members who prey on migrants in the camp. Jessica told U.S. immigration officers about their fear of remaining in Mexico. With no other options, the family remains at the encampment, awaiting their next hearing, in fear for their lives.

23. **Plaintiff Henry and his daughter Carolina, age 15,** are asylum seekers from Honduras. Pursuant to MPP-Tamaulipas they have been stranded in Tamaulipas since September 2019. After being returned, Henry and Carolina have been repeatedly extorted and threatened with death. They have tried to get help from Mexican authorities, to no avail. Henry and Carolina are staying at the encampment in Matamoros, where they live in terror because of the hostility and targeting of migrants they have witnessed there. They remain in Matamoros, awaiting their next hearing, in fear for their lives.

24. **Plaintiff Armando and his son Salvador, age three,** are asylum seekers from Venezuela. Pursuant to MPP-Tamaulipas they have been stranded in Tamaulipas since October 2019. After being returned to Tamaulipas, Armando and his son were kidnapped by the cartel and Armando was forced to work long hours under threat of death. Cartel members also threatened to sell his son to organ traffickers. Armando told U.S. officials about the kidnapping

and threats. But he and his son were sent back. They remain in Matamoros, rarely going out, awaiting their next hearing, in fear for their lives.

25.      **Plaintiff Carmen and her children Lola, age five, and Esteban, age one,** are asylum seekers from Honduras. Pursuant to MPP-Tamaulipas, they have been stranded in Tamaulipas, since September 2019. After being sent to Tamaulipas, the family was kidnapped, and Carmen was repeatedly gang raped in front of her children over a period of days. Barely one month later, her attackers kidnapped the family again and again raped Carmen in front of her children. Carmen told U.S. officers what happened and asked not to be returned. The family remains in hiding, awaiting their next hearing, in fear for their lives.

**Defendants**

26.      **Defendant Chad F. Wolf** is the Acting Secretary of Homeland Security. He is sued in his official capacity. Defendant Wolf is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103 and directs each of the component agencies within DHS. Defendant Wolf oversees the implementation of MPP.

27.      **Defendant U.S. Department of Homeland Security ("DHS")** is a cabinet-level department of the federal government. Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). USCIS, through its asylum officers, is responsible for the MPP fear screenings. CBP is responsible for the initial processing and detention of noncitizens who are apprehended at or between U.S. ports of entry. ICE is responsible for determining where and how migrants placed in MPP must present for their removal proceedings, and aiding CBP, when necessary, in transporting individuals back to Mexico. DHS, through these three sub-agencies, implements MPP.

## BACKGROUND

**A. Defendants' Adoption and Expansion of MPP**

28.     For decades, individuals applying for asylum at the southern border remained in the

United States while their asylum applications were being considered in U.S. immigration courts.

Thus, asylum seekers had temporary refuge in the United States while their proceedings were

pending.

29.     On December 20, 2018, DHS announced what it called an "unprecedented" change:

Under the new "Migrant Protection Protocols" ("MPP"), DHS would begin requiring certain

noncitizens who arrive in or enter the United States from Mexico "illegally or without proper

documentation" to be "returned to Mexico for the duration of their immigration proceedings."[5]

30.     Individuals subjected to MPP are put into removal proceedings under 8 U.S.C. § 1229a,

ordered to appear for their immigration hearings at a U.S. port of entry at a future date, and

physically returned to Mexico.

31.     On the date of their hearing, individuals must report to their designated port of entry or

risk receiving a removal order (*i.e.*, a deportation order) for failure to appear. At the conclusion

of a hearing, an individual is sent back to Mexico through the same port of entry to await the

next hearing.

32.      This process repeats for as many hearings as necessary to conclude the person's

immigration proceedings, including appeals. Aside from their hearing dates, asylum seekers are

forced to wait in Mexico until their claims for protection are adjudicated, a process that typically

takes at least six months and involves multiple hearings, not counting any appeal or the current

delays from the coronavirus pandemic.

---

[5] *See* Press Release, U.S. Dep't of Homeland Sec., *supra* note 1.

33.     Critically, in recognition of the United States' obligations under both domestic and international law to not return asylum seekers to a country where they are subject to persecution or torture ("nonrefoulment obligations"), MPP does not apply to any individual "who is more likely than not to face persecution or torture in Mexico."[6] Under MPP, CBP officers are prohibited from placing any such individuals in MPP, and if any such individuals were already sent to Mexico under MPP, CBP must remove them from MPP and allow them to pursue their asylum cases from inside the United States.[7] Although MPP does not require that CBP officers ask individuals if they fear return to Mexico, if an individual expresses such a fear, the terms of MPP require that CBP refer them to an asylum officer for a nonrefoulement interview. The "more likely than not" fear standard is the same as the one that applies to withholding of removal and CAT decisions and is governed by the same regulations.[8]

34.     On January 28, 2019, DHS, announced that it would begin MPP at the San Ysidro port of entry in San Diego, California, and that expansion to other ports of entry and border areas was anticipated "in the near future."[9]

---

[6] U.S. Customs and Border Prot., *MPP Guiding Principles*, U.S. DEP'T OF HOMELAND SEC. (Jan. 28, 2019), https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf.

[7] *Id.*

[8] U.S. Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols* (PM-602-0169) (Jan. 28, 2019), available at https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2019/2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf ("That is the same standard used for withholding of removal and CAT protection determinations. *See* 8 C.F.R. § 208.16(b)(2), (c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (1999).").

[9] Memorandum from Kevin K. McAleenan, Comm'r, U.S. Customs and Border Prot., to Todd C. Owen, Exec. Assistant Comm'r of Field Operations, U.S. Customs and Border Prot., et al., (January 28, 2019), https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/Implementation%20of%20the%20Migrant%20Protection%20Protocols.pdf.

35.     In March 2019, DHS expanded MPP to the ports of entry in Calexico, California and El Paso, Texas. Thereafter, individuals seeking to enter at or near these ports were returned through those ports and required to report back to designated ports of entry for their hearings.

36.     In July 2019, without explanation, DHS expanded MPP to the Mexican border state of Tamaulipas. Thereafter, under MPP-Tamaulipas, individuals entering the United States at or near the Texas ports of Laredo, McAllen, or Brownsville are returned through these ports to Tamaulipas, and required to present at either Brownsville or Laredo for future immigration hearings.

37.     Prior to DHS's decisions to expand MPP, a group of individuals and organizations affected by MPP filed a lawsuit challenging MPP as unlawful, including because it is a violation of the INA and the APA. The U.S. District Court for the Northern District of California issued a preliminary injunction against MPP, finding that the plaintiffs were likely to succeed on their claims that the INA did not authorize DHS to return to Mexico the class of asylum seekers who were being subjected to MPP, and that the fear screening procedures violated the United States' nonrefoulement obligations. *Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110 (N.D. Cal. 2019), *aff'd sub nom. Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020). After granting a stay on the injunction pending the government's appeal, *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510, the Ninth Circuit recently affirmed the district court's preliminary injunction order on both grounds, *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1095. That injunction has since been stayed by the Supreme Court pending petition for certiorari. *Wolf v. Innovation Law Lab*, No. 19A960, 2020 WL 1161432, at *1 (U.S. Mar. 11, 2020).

**B.  The Dangers Facing Migrants in Tamaulipas Are Extreme and Widely Recognized**

38.     DHS expanded MPP to MPP-Tamaulipas despite Tamaulipas long being recognized as

the most violent region on the southern border and one of the most violent regions in the world.

39.     Since at least 2018 the State Department has assigned Tamaulipas a "Level 4: Do Not

Travel" advisory—the highest level of warning, and one assigned to active-combat zones such as

Afghanistan, Iraq, and Syria.

40.     The State Department's April 2019 advisory for Tamaulipas – issued three months before

DHS began sending asylum seekers to Tamaulipas – warns:

> "**Do not travel due to crime and kidnapping.**
>
> . . . [K]idnapping, forced disappearances, extortion, and sexual assault –[are]
> common along the northern border [with the United States]. . . . Criminal groups
> target public and private passenger buses as well as private automobiles traveling
> through Tamaulipas, often taking passengers hostage and demanding ransom
> payments. Heavily armed members of criminal groups often patrol areas of the
> state in marked and unmarked vehicles and operate with impunity particularly
> along the border region from Reynosa northwest to Nuevo Laredo. In these areas,
> local law enforcement has limited capability to respond to crime incidents.[10]

41.     Tamaulipas is the only Mexican border state with such a high-level travel advisory. The

other Mexican border states where DHS applies MPP have, prior to the travel restrictions related

to the coronavirus pandemic, received only Level 2 or 3 travel advisories.[11] While these

advisories also warn about the dangers of travel to those covered areas, they do not impose

unequivocal travel restrictions based on safety concerns.

---

[10] U.S. Dep't of State, Mexico Travel Advisory (Apr. 9, 2019) (emphasis added).

[11] The State Department has more recently issued a global health advisory advising U.S. citizens
to avoid all international travel due to the global impact of COVID-19. *See* U.S. Dep't of State,
*Global Level 4 Health Advisory – Do Not Travel* (Mar. 31, 2020),
https://travel.state.gov/content/travel/en/traveladvisories/ea/travel-advisory-alert-global-level-4-
health-advisory-issue.html.  This is separate from the Level 4 Travel Advisory that has applied to
Tamaulipas since at least early 2018.

42.     The gravity of the danger associated with a Level 4 travel advisory is highlighted by the State Department's instructions that anyone who chooses to travel to "high risk" areas such as Tamaulipas should make a will, designate a family member to negotiate with kidnappers, and establish secret questions and answers to verify that the traveler is still alive when kidnappers reach out to family.[12]

43.     Similarly, in April 2019, the State Department's Overseas Security Advisory Council, which traces overseas security environment through the help of the U.S. private sector, described Nuevo Laredo and Matamoros, and Tamaulipas as a whole, as extraordinarily dangerous.[13]

44.     These travel advisories and reports are consistent with years of State Department country reports documenting extreme violence in Tamaulipas and/or the targeting of migrants, perpetrated by state and non-state actors, such as the victimization of migrants by criminal groups, police, immigration officers, and customs officials. They also document the highest rates of missing or disappeared persons reported in Tamaulipas.[14]

45.     Thus, at the time that Defendants expanded MPP to Tamaulipas, they were well aware— or should have been aware—that the dangers in Tamaulipas were both so extreme as to warrant

---

[12] *See* U.S. Dep't of State, *High-Risk Area Travelers*, https://travel.state.gov/content/travel/en/international-travel/before-you-go/travelers-with-special-considerations/high-risk-travelers.html (last updated Nov. 6, 2019).

[13] U.S. Dep't of State, Overseas Security Advisory Council, Mexico 2019 Crime & Safety Report: Nuevo Laredo (April 3, 2019), https://www.osac.gov/Content/Report/4811d231-eea0-4a49-b25c-15f4aec0eb64; U.S. Dep't of State, Overseas Security Advisory Council, Mexico 2019 Crime & Safety Report: Matamoros (April 2, 2019), https://www.osac.gov/Content/Report/03b73ba8-0cd3-4772-bc97-15f4aebfc985.

[14] U.S. Dep't of State, 2018 Country Reports on Human Rights Practices: Mexico (2019), https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/mexico/; U.S. Dep't of State, 2017 Country Reports on Human Rights Practices: Mexico (2018), https://www.state.gov/reports/2017-country-reports-on-human-rights-practices/mexico/; U.S. Department of State, 2016 Country Reports on Human Rights Practices: Mexico (2017), https://www.state.gov/reports/2016-country-reports-on-human-rights-practices/mexico/.

the highest level of travel advisory and of a higher order than those in other border regions in Mexico where MPP was already being applied; that kidnapping in Tamaulipas was rampant; and, that migrants are a prime target for kidnapping.

46.     The Mexican government also recognized the extreme dangers in Tamaulipas. In July 2019, Mexico's ambassador to the United States, Martha Bárcena Coqui, acknowledged that the Mexican government was not prepared for the expansion of MPP to Tamaulipas because of the extreme dangers there: "We recognize there are certain areas of Mexico in which the challenges of security are higher," Bárcena said. "So, that is why we have been very careful of not opening up, for example, the return [of migrants to] Tamaulipas."[15]

47.     Nonetheless, despite widespread recognition of the extreme dangers in Tamaulipas, and the targeting of migrants in particular, Defendants decided to expand MPP there, a decision that has had disastrous consequences.

### C. MPP-Tamaulipas Exposes Returned Migrants to a Pattern or Practice of Persecution in Tamaulipas Among Other Harms

48.     Asylum seekers who are sent to Tamaulipas live in constant danger of kidnapping, assault, extortion, sexual violence, and death. MPP-Tamaulipas exposes asylum seekers to these dangers by forcing them to remain in Tamaulipas for the extended period of time required for their immigration proceedings and by making them easily identifiable targets for persecution by local criminal groups, like cartels and gangs, who control the region and act with impunity.

49.     Since July 2019, some 27,000 asylum seekers, have been subjected to MPP-Tamaulipas. As described in one recent human rights report, asylum seekers sent to Tamaulipas are like "fish

---

[15] Roll Call, *CQ Roll Call and the Meridian International Center Holds Discussion on Trade, Immigration and Foreign Affairs* (Jul. 18, 2019), https://plus.cq.com/doc/newsmakertranscripts-5600704?3.

in a barrel."[16] Kidnappings, extortion, beatings, assaults, and sexual violence against asylum seekers in Nuevo Laredo and Matamoros are so common that they have become a business model for cartels.[17]

50.     Asylum seekers in Tamaulipas are targeted because of their status as non-Mexicans. Non-Mexican migrants are viewed as outsiders, inferior, and a burden on the local community, thus leading to their stigmatization, marginalization and victimization by cartels and others. Asylum seekers in Tamaulipas are also targeted based on other grounds, including their gender and their sexual orientation.

51.     Mexican authorities are both unwilling and unable to offer migrants protection from this targeted violence. They have little to no ability to stop cartel members or street gangs. Additionally, some Mexican officials collude with cartels and gangs in these acts of violence.

52.     MPP-Tamaulipas puts returned asylum seekers at risk of being targeted in several ways that relate back to the fact that all asylum seekers returned under MPP-Tamaulipas must spend time in an extraordinarily dangerous region.

53.     *First*, individuals who are processed for MPP-Tamaulipas are dropped off by CBP officers at the bridge connecting Laredo, Texas to Nuevo Laredo, Tamaulipas or the bridge connecting Brownsville, Texas to Matamoros, Tamaulipas. There, they are easy prey for the cartels, who have lookouts waiting for them. Many are kidnapped within moments of their return.

---

[16] Human Rights Watch, *U.S. Move Puts More Asylum Seekers at Risk* (Sept. 25, 2019), https://www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk.

[17] *See, e.g.*, *The Out Crowd*, THIS AMERICAN LIFE (Nov. 5, 2019), https://www.thisamericanlife.org/688/transcript; Emily Green, *Trump's Asylum Policies Sent Him Back to Mexico. He was Kidnapped Five Hours Later by a Cartel,* VICE (Sept. 16, 2019), https://www.vice.com/en_us/article/pa7kkg/trumps-asylum-policies-sent-him-back-to-mexico-he-was-kidnapped-five-hours-later-by-a-cartel.

54.     *Second*, DHS orders migrants to appear for their immigration court hearings in Laredo or Brownsville, Texas, usually early in the morning. This means they must present themselves on the bridges that link Nuevo Laredo and Matamoros to these cities by 4 or 4:30 in the morning-- essentially the middle of the night. Doing so, especially during the early morning hours, makes them readily identifiable to the cartels.

55.     *Third,* for those migrants who have sought safety from the dangers in Nuevo Laredo or Matamoros by relocating elsewhere, the necessity of traveling back to these cities for their hearings poses additional risks. The cartels routinely target migrants at bus stations while also stopping cars and buses en route.

56.     *Finally*, after their hearings, DHS sends migrants back from Laredo or Brownsville, Texas, across the bridges to Nuevo Laredo or Matamoros, Tamaulipas, to await their next hearings. Because immigration proceedings require multiple hearings over a period of many months, individuals are repeatedly subjected to the danger of being dropped off at the bridges connecting the United States with Nuevo Laredo and Matamoros, and having to appear at these same locations for their subsequent hearings.

57.     The dangers in Tamaulipas have also made it difficult for bona fide asylum seekers to pursue their cases. Lawyers are afraid to travel to Tamaulipas to meet with asylum seekers there, and asylum seekers are afraid to travel to their hearings, resulting in their being ordered removed *in absentia.*

58.     In addition to placing migrants in danger, MPP-Tamaulipas has forced many to survive in unsafe and unsanitary living conditions. This is particularly the case for those at the migrant encampment in Matamoros, which has been considered worse than other refugee camps in terms of security and access to medical care. Conditions at the camp are so dire that many parents have

sent their children to present at the port of entry alone, as unaccompanied minors. During the

first three weeks of November 2019, more than 50 migrant children, some as young as three

years old, were sent unaccompanied from Matamoros to the Brownsville port of entry.[18] Recent

statistics suggest that the numbers are climbing.[19]

### D. Plaintiffs Have Suffered Serious Harm as a Result of Being Subjected to MPP-Tamaulipas

59.    Plaintiffs' experiences are consistent with the dangers present in Tamaulipas and the

pattern or practice of persecution of migrants described above.

60.    *All* Plaintiffs have been kidnapped, raped, assaulted, nearly kidnapped, and/or subjected

to psychological abuse and threatened with death in Tamaulipas after being sent there by

Defendants. Indeed, many suffered horrific abuse in Tamaulipas even before being initially

processed for MPP. Nonetheless, they were sent back to Tamaulipas—multiple times—where

they have been subjected to additional abuse.

61.    **Nora and her three-year-old son** were kidnapped before crossing the border to seek

asylum in the United States. They were nonetheless returned to Matamoros, Tamaulipas, where

they were kidnapped again. For an untold amount of time, Nora was repeatedly gang raped in

front of her son, her attackers threatening to kill her son should she resist. Nora and her son

moved to another part of Tamaulipas to escape her attackers. But she lives in constant fear of

them coming back, barely leaving her room. She is also terrified about traveling to Matamoros

---

[18] Kevin Sieff, *In Squalid Mexico Tent City, Asylum Seekers Are Growing So Desperate They're Sending Their Children Over the Border Alone*, WASHINGTON POST (Nov. 22, 2019), https://www.washingtonpost.com/world/the_americas/in-squalid-mexico-tent-city-asylum-seekers-are-growing-so-desperate-theyre-sending-their-children-over-the-border-alone/2019/11/22/9e5044ec-0c92-11ea-8054-289aef6e38a3_story.html.

[19] Priscilla Alvarez, *At Least 350 Children of Migrant Families Forced To Remain in Mexico Have Crossed Over Alone to US*, CNN (Jan. 24, 2020), https://www.cnn.com/2020/01/24/politics/migrant-children-remain-in-mexico/index.html.

for her next hearing. Migrants in transit in Tamaulipas are at great risk of being kidnapped. But if she does not show up she will be ordered removed.

62.     **Jonathan and his three-year-old son** were also kidnapped in Tamaulipas after being sent to Matamoros pursuant to MPP. His kidnappers put him through a gauntlet of torture methods, as described in the declaration filed with this complaint. Despite multiple pleas to U.S. immigration officers, he too was, at least twice, sent back to Matamoros, Tamaulipas, where he is in ongoing danger.

63.     **Fabiola** and her two children were kidnapped, starved with little to no food or water, and threatened with death in Tamaulipas, before finally being released and crossing into the United States to seek protection. They were also returned to Matamoros, Tamaulipas, where Fabiola's eight-year-old son was nearly kidnapped upon arrival, followed by another near kidnapping and assault of Fabiola. After unsuccessfully pleading to be taken out of MPP, Fabiola and her children were sent back to Matamoros—where they were again nearly kidnapped near the migrant camp. Because her children lived in a constant state of terror, Fabiola made the difficult decision to send them across the border without her.

64.     **Laura, her husband Joseph, and their two children** were also kidnapped in Tamaulipas prior to crossing into the U.S. to seek protection. The cartel members who kidnapped them, beat Joseph with a heavy plank, and terrorized the children. Upon finally releasing the family, the cartel threatened them with death should they ever leave Nuevo Laredo without complying with their demands. Nonetheless, despite explaining to U.S. immigration officials how they were targeted for being migrants, the family was sent back to Nuevo Laredo, Tamaulipas, where they live in hiding, terrified, under the constant monitoring of the cartel.

65.    Before making their way to the United States, **Jessica and her two sons** were kidnapped for more than a month in Tamaulipas, confined in a filthy room strewn with garbage and teeming with cockroaches, and starved for days. **Diana and her children** were robbed by armed gang members and Diana's daughter**, Wanda**, age 17, was kidnapped and repeatedly raped. Both families were, nevertheless, sent back to Matamoros, Tamaulipas. They currently reside at the migrant encampment there, where cartel members regularly target migrants for kidnapping, and women migrants for sexual assault. Wanda has been targeted for both and barely escaped. She is afraid to leave her tent.

66.    **Henry and his daughter Carolina** were kidnapped on the way to the border and held for ransom for over a week. Despite expressing fear to U.S. officers after reaching the border, they were returned to Matamoros, Tamaulipas, to await their immigration hearing, and were forced to live in the migrant encampment. While at the camp, Henry was extorted by men Henry believes are associated with organized crime. They forced him to pay them a fee, with threats to kill him or kidnap his daughter.

67.    Other Plaintiffs were first targeted following forced return to Tamaulipas under MPP. After these incidents of violence, on return to the border, they too were unsuccessful in pleading to U.S. officials to be taken out of MPP.

68.    **Ernesto** was assaulted at the Nuevo Laredo bus station within a day of his being returned there. The assaults have continued in the months since. On a weekly basis the cartels force their way into his residence in Tamaulipas and demand, sometimes at gun point, payment for his being allowed to remain in the area. When the cartel members found out he was gay, they increased the amount he must pay, explaining that gay men require more protection. Ernesto tried to move, but the cartel found him.

69.     After being returned to Matamoros, Tamaulipas, **Emilia and her daughter Gabriela** were gang raped on two occasions. The first time they were abducted from the encampment in Matamoros where they were staying; the second time they were attacked in the apartment in Monterrey where they had relocated to find safety. The kidnappers followed them there, broke into the apartment and proceeded to rape them both again. They continue to live in fear of their rapists returning.

70.     **Armando and his son Salvador** were kidnapped as soon as they were returned to Matamoros, Tamaulipas, and Armando was forced to work for the cartels under threat of death. In addition, the cartels threatened to sell his son Salvador for body parts if Armando did not cooperate. Armando is currently in hiding with his son.

71.     **Carmen** was kidnapped and gang raped on two occasions, both in Nuevo Laredo, Tamaulipas. The first time occurred as she was walking back from work to the shelter where she was staying. Three men kidnapped her, then repeatedly raped her in front of her young children over a period of days. Barely a month later, the same men entered the shelter, again kidnapped her and her children, and repeatedly raped her in front of her children, threatening to make her five-year old daughter engage in sexual acts if Carmen resisted. Carmen fled with her children to Matamoros. She is afraid to return to Nuevo Laredo for her hearing because of fear that these same men will come back to hurt her.

72.     All of the Plaintiffs were targeted on account of their status as foreigners in Mexico, among other protected grounds, such as sexual orientation or gender. Laura, Ernesto and Fabiola describe standing out as non-Mexicans because of their accents and mannerisms. Jessica reports that she and other migrants in the Matamoros encampment have been repeatedly called "invaders of the land" and told to "go back where [they] came from." Emilia's daughter, Gabriela, was

attacked on the street by another girl who screamed at her to get out of Mexico. Carmen reports that when she asked one of the men who kidnapped and raped her in Nuevo Laredo why he was doing this, he told her that they did this to all Central Americans who came to Nuevo Laredo because they did not want to see more Central Americans in town.

73.     Plaintiffs are unable to seek protection from Mexican police. For example, despite being assaulted and extorted on a weekly basis in Matamoros, Ernesto has been refused help by the police, who told him he had no rights because he was a "migrant." Nora—who was kidnapped and gang-raped—filed a report with Mexican authorities to no avail; her perpetrators remain at large. Similarly, Diana reported her daughter's near-kidnapping to the Mexican Marines, with no consequence to the perpetrators.

74.     Plaintiffs continue to suffer additional harms while they wait for their proceedings to conclude—a process which typically takes at least six months. All of the Plaintiffs have already been in Tamaulipas for at least four months, most for at least six, and some for over eight. Moreover, in light of DHS's decision to temporarily suspend MPP removal proceedings because of the coronavirus, their wait could be indefinitely extended.[20]

75.     Most Plaintiffs live either in hiding or on self-imposed lockdown in their tents or shelters. Many, like Nora and Carmen, are terrified of appearing for their next court hearings because appearance will require travel to the border.

76.     Finally, some of the Plaintiffs who are parents, like Nora and Jessica, are so desperate about the dangers their children are facing that they are contemplating sending their children to the border to cross on their own, as Plaintiff Fabiola already did with her two young children.

---

[20] *See supra* note 4.

Other Plaintiffs, like Jonathan's son and Carmen's children, have been suffering the consequences of separation from their parents and other caregivers in the United States.

### E. Despite Reports of the Harms Faced by Migrants in Tamaulipas, Defendants Continue to Return Plaintiffs to Face Persecution and Torture There

77.     Defendants have continued to implement MPP-Tamaulipas despite repeatedly being put on notice of the rampant violence and other harms migrants are suffering as a result thereof.

78.     Each of the Plaintiffs, other than Diana, have put immigration officials on notice as to the harms they and their families have experienced in Tamaulipas through requests for nonrefoulement interviews to take them out of MPP and through the information shared in these interviews. Notwithstanding clear evidence of the persecution and torture they have already suffered in Tamaulipas, Defendants have refused to take them out of MPP, instead returning them to Tamaulipas. *See* Sec. F, *infra*.

79.     Plaintiff Diana has put immigration officials on notice about her fears in Tamaulipas, but has never been provided with a nonrefoulement interview.

80.     As described above, before DHS expanded MPP to MPP-Tamaulipas, the dangers in Tamaulipas were well documented and known, or should have been known, by Defendants. Since the expansion of MPP to MPP-Tamaulipas, numerous other sources, including congressional hearings, media reports, and letters from more than a hundred humanitarian, legal, civil rights, and community organizations, academics, and U.S. Senators, have described the violence faced by individuals returned pursuant to MPP-Tamaulipas.[21]

---

[21] *See, e.g., Examining the Human Rights and Legal Implications of DHS' "Remain in Mexico" Policy: Hearing Before the Subcomm. on Border Sec., Facilitation & Operations of the H. Comm. on Homeland Sec.*, 116th Cong. (2019), https://homeland.house.gov/activities/hearings/examining-the-human-rights-and-legal-implications-of-dhs-remain-in-mexico-policy; Letter from U.S. Sens. to Mike Pompeo, Sec'y of

81.     For example, on December 9, 2019, the ACLU and Center for Gender and Refugee Studies sent Defendants nearly 70 government, nongovernment and media reports, and other sources documenting the dangers in Tamaulipas, along with a demand to immediately cease MPP-Tamaulipas.[22]

82.     More recently, on January 14, 2020, the House Judiciary Committee announced an investigation into MPP, denouncing the policy for "exposing thousands of people to threats of murder, sexual violence, and kidnapping as they are forced to wait in extremely dangerous conditions before their asylum claims may be heard."[23]

83.     Nonetheless, Defendants have continued to implement MPP-Tamaulipas.

84.     Indeed, Defendants have shown themselves to be remarkably indifferent to the violence that migrants suffer as a result of MPP-Tamaulipas.

85.     Defendant Mark A. Morgan, CBP Acting Commissioner, told reporters in December 2019: "I have heard reports the same as you of violence," noting that it is well known that dangerous drug cartels target migrants south of the border. "We encourage these people first of all not to even put themselves in the hands of the cartels to begin with."

---

State, and Kevin McAleenan, Acting Sec'y, U.S. Dep't of Homeland Sec. (Aug. 27, 2019), https://www.foreign.senate.gov/imo/media/doc/08-27-19%20DEms%20letter%20to%20State%20&%20DHS%20re%20Remain%20in%20Mexico%20policy.pdf (calling o n DHS to end MPP because of "the dangerous conditions it forces asylum seekers to endure.").

[22] Letter from American Civil Liberties Union and Center for Gender & Refugees Studies to Chad Wolf, Acting Sec'y, U.S. Dep't of Homeland Sec., et al. (Dec. 9, 2019), https://www.aclu.org/other/re-implementation-migrant-protection-protocols-mpp-tamaulipas-state.

[23] Letter from Jerrold Nadler, et al. on behalf of the House Committee on the Judiciary to Chad Wolf, Acting Sec'y, U.S. Dep't of Homeland Sec. (Jan. 14, 2020), https://judiciary.house.gov/uploadedfiles/judiciary_objections_to_mpp.pdf.

**F.  Defendants Have Failed to Follow Their Own Nonrefoulement Rules in Returning Plaintiffs to Face Persecution and Torture in Tamaulipas**

86.     Defendants have also failed to follow the rules they have adopted to ensure that individuals who are more likely than not to face persecution or torture in Mexico will not be returned there.

87.     MPP specifically provides that individuals who express a fear of return to Mexico will be given an interview with an asylum officer to determine if they meet this standard. And that if they do meet the standard, they will be exempted from MPP. In returning each of the Plaintiffs to Tamaulipas, Defendants have failed to follow at least one, and in most cases both, of these mandates.

88.     Nora, Fabiola, Laura, Diana, and Ernesto, all expressed fears of being returned to Mexico when they were first being processed by CBP agents for return to Mexico under MPP. Each had just recently suffered horrific abuse in Mexico. But CBP agents did not refer them for nonrefoulement interviews as the agency's own MPP terms require. Instead, Defendants returned them to Tamaulipas. Indeed, when Laura told the CBP officers about her family's recent kidnapping on account of their identity as non-Mexicans, the officer nevertheless told her that because she had not been raped, the family would be sent back to Mexico. When Diana expressed her fear of being in Mexico and refused to sign her documents, she was told that they would take care of the paperwork, and she and her children were sent back to Mexico.

89.     Jessica, who had just escaped with her family from a month-long kidnapping, was not allowed to speak at all when she was processed by CBP; she was shocked when she later learned that she and her two sons were being sent back to Mexico.

90.     Both Fabiola and Diana made several additional attempts to obtain nonrefoulement interviews by going to the bridge in Matamoros, Tamaulipas, after having been returned to

Mexico, to plead their cases with U.S. immigration officials. But U.S. immigration officials turned them away.

91.     When Defendants did provide Plaintiffs with nonrefoulement interviews, they improperly rejected their claims of fear, contrary to the evidence. Notwithstanding the well-known pattern or practice of persecution against migrants in Tamaulipas, as well as the significant harms each of the Plaintiffs had suffered, Defendants did not find that a single one had had established a likelihood of persecution or torture in Mexico.

92.     Agency regulations provide that an individual showing of past persecution creates a presumption of future persecution, which can only be rebutted in certain limited circumstances. *See* 8 C.F.R. § 208.16(b)(1). Regulations also provide that where a pattern or practice of persecution exists against a particular group, individuals can show a likelihood of persecution by showing that they are members of that group. *See* 8 C.F.R. § 208.16(b)(2).

93.     All of the Plaintiffs are migrants and all of the Plaintiffs have suffered serious harm that rises to the level of persecution or torture. Defendants improperly rejected their credible claims of fear and returned them to Mexico by either failing to apply the appropriate nonrefoulement standard, or failing to consider evidence presented by Plaintiffs.

94.     For example, at her nonrefoulement interview Nora recounted how she was kidnapped and gang raped by men in Matamoros, Tamaulipas who targeted her as a single migrant woman. The interviewer found she had failed to establish a likelihood of persecution or torture, and she was sent back to the same place where she had been persecuted and tortured.

95.     Jonathan had two nonrefoulement interviews, in which he recounted the details of his kidnapping and brutal physical and psychological torment in Tamaulipas. Yet, immigration officials concluded he was not likely to be persecuted or tortured in Mexico, and he and his son

were returned to Tamaulipas, where they have since been living in hiding from the cartel. Notably, Jonathan tried to present evidence, including photographs, to corroborate his statements, which officers refused to consider.

96.     Emilia received two nonrefoulement interviews, where she presented testimony of the repeated kidnappings and rapes to which she and her daughters were subjected because of their status as Central American women. U.S. immigration officials nonetheless decided to return the family to Mexico.

97.     When Fabiola received a nonrefoulement interview, she described her family's kidnapping and subsequent near-kidnapping in Tamaulipas, and their fear of remaining in Mexico. The officers still returned her and her two children to Matamoros. Just two days later, she was assaulted and nearly kidnapped again. Despite describing this at a second nonrefoulement interview, she was nevertheless returned to Matamoros. During both interviews, Fabiola was repeatedly cut off and unable to explain her fear to the officers.

98.     Ernesto expressed his fears of being returned to Mexico at a nonrefoulement interview, describing the weekly visits by the cartel to his residence in Tamaulipas to demand money from him at gunpoint. He was nevertheless returned to Matamoros.

99.     Laura, her husband, and two children had one nonrefoulement interview where they described how they were targeted and kidnapped in Nuevo Laredo, and continued receiving threats from the cartel. They were sent back to Nuevo Laredo without any explanation.

100.    Jessica and her two sons failed their nonrefoulement interview as well, despite describing how they were kidnapped and held for over a month in Tamaulipas, during which they were withheld food for days. Like Fabiola, Jessica was unable to fully explain her fear of return because immigration officers repeatedly cut her off and did not allow her to explain herself.

101.    After her daughter was nearly kidnapped, Diana approached a U.S. immigration official at the international bridge in Matamoros, begging for help. She was nevertheless turned around and told to wait for her hearing. However, that hearing was cancelled and she has not had an opportunity to present her fears in a nonrefoulement interview.

102.    Henry and his daughter were kidnapped on the way to the border, held for over a week and forced to pay their kidnappers a ransom. Despite explaining these fears to an immigration officer at a nonrefoulement interview, he was returned to Mexico. In the Matamoros encampment, he was again extorted, and threatened with death.

103.    Armando and his son had a nonrefoulement interview where he described his kidnapping and forced labor for the cartel in Tamaulipas. The U.S. immigration officer focused the interview on irrelevant details, such as the precise address of where Armando was kidnapped, and the content of his kidnapper's friendly conversations with police, rather than allowing Armando to present photographs documenting his captivity or to speak freely about his fears. The officer ultimately sent him and his son back to Matamoros.

104.    After her first kidnapping and rape in Nuevo Laredo, Carmen had a nonrefoulement interview where she explained how she had been gang raped repeatedly in front of her children. She was nevertheless returned to Tamaulipas, where she was soon thereafter kidnapped and raped again by the same perpetrators.

## FIRST CLAIM FOR RELIEF

### (Administrative Procedure Act, 5 U.S.C. § 706(2), Arbitrary and Capricious Agency Action in Adopting MPP-Tamaulipas)

105.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

106.    Defendants' decision to expand MPP to Tamaulipas was arbitrary and capricious, given the extreme violence that DHS knew migrants would face in Tamaulipas.

107.    The adoption of MPP-Tamaulipas cannot be squared with Defendants' stated commitments to ensure that "[v]ulnerable populations will get the protection they need" while waiting in Mexico and to "strengthen our humanitarian commitments" to "legitimate asylum-seekers." Given what Defendants knew or should have known about the level of violence in Tamaulipas, it was entirely foreseeable that returning migrants to Tamaulipas would place migrants in danger and that such return would undermine the ability of bona fide asylum seekers to pursue their claims.

108.    Defendants failed to engage in reasoned decisionmaking, including because they provided no reasoned explanation for their decision to adopt MPP-Tamaulipas and failed to consider an important aspect of the problem: the severe harm that would be inflicted on asylum-seekers returned to Tamaulipas.

## SECOND CLAIM FOR RELIEF

### (Violation of Due Process Clause,
### Fifth Amendment to the United States Constitution)

109.    The Fifth Amendment of the Constitution protects an individual's liberty interest in bodily security. The federal government violates this substantive due process right when it affirmatively places an individual in a position of danger, creating or increasing the potential for harm.

110.    Defendants have engaged in affirmative conduct that they knew or should have known places Plaintiffs in danger. Defendants knew or should have known that MPP-Tamaulipas exposes asylum seekers to obvious and substantial risks of being victims of assault, kidnapping, sexual violence and other crimes as they are forced to wait in or transit through Tamaulipas.

111.    Defendants have forced each of the Plaintiffs to remain in, and/or repeatedly transit through, Tamaulipas despite Defendants' knowledge of the severe harms that Plaintiffs have experienced and the continuing serious and obvious risk of assault, kidnapping, sexual violence and other crimes.

112.    Despite notice of these dangers, Defendants have continued to act with deliberate indifference toward Plaintiffs' bodily security.

113.    Defendants' conduct is so egregious and outrageous that it shocks the conscience.

114.    For these reasons, Defendants have violated Plaintiffs' due process rights both by adopting and applying MPP-Tamaulipas, and additionally by subjecting and continuing to subject Plaintiffs to MPP-Tamaulipas.

## THIRD CLAIM FOR RELIEF

### (Administrative Procedure Act, 5 U.S.C. § 706(2), and *Accardi* doctrine, Unlawful Agency Action)

115.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "without observance of procedure required by law," *id.* § 706(2)(D). The *Accardi* doctrine requires that agencies follow their own regulations, policies, and procedures. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

116.    DHS's rules require that migrants who are "more likely than not" to face persecution or torture in Mexico must be exempted from MPP. These rules further mandate certain procedures for making fear determinations, including the standard under which fear determinations should be adjudicated. Defendants failed to comply with both.

117.    For example, the MPP's rules mandate that any migrants who express a fear of returning to Mexico must be referred for a nonrefoulement interview before an asylum officer to determine

if they should be exempted from MPP. Defendants, however, failed to provide Plaintiff Diana with a nonrefoulement interview notwithstanding that she expressed such a fear. In addition, Defendants failed to provide Plaintiffs such as Fabiola and Jessica with a meaningful opportunity to explain their fears of persecution at their nonrefoulement interviews, and denied Plaintiffs such as Jonathan the opportunity to present evidence of the harms he had suffered.

118.    Moreover, Defendants failed to properly adjudicate the nonrefoulement interviews for the Plaintiffs who received them. Agency rules and regulations provide that an individual can establish a presumption of future persecution by a showing of past persecution. In addition, where there is a "pattern or practice of persecution" against a certain group, individuals can establish a likelihood of persecution merely by showing their membership in the group against which the pattern or practice of persecution exists. *See* 8 C.F.R. § 208.16(b). Defendants failed to apply these standards in the nonrefoulement interviews Plaintiffs received .

119.    Had Defendants applied these presumptions, each of the Plaintiffs who had nonrefoulement interviews would have been exempted from MPP. Plaintiffs described at their fear interviews how they had suffered past persecution in Tamaulipas. Further, at the time of these interviews, evidence demonstrated a pattern or practice of persecution of migrants in Tamaulipas.

120.    Despite evidence of both past persecution and a pattern or practice of persecution, Defendants found that each of the Plaintiffs had failed to establish a likelihood of persecution or torture and returned them to Tamaulipas.

121.    For all of these reasons, Defendants' decisions to return Plaintiffs to Tamaulipas under MPP were unlawful under the APA and the *Accardi* doctrine.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully ask this Court to:

a.      Declare that the return of each of the Plaintiffs to Mexico pending their removal proceedings, pursuant to MPP-Tamaulipas, was unlawful under the APA and the *Accardi* doctrine;

b.      Declare that the return of each of the Plaintiffs to Mexico pending their removal proceedings, pursuant to MPP-Tamaulipas, was unlawful in violation of Plaintiffs' rights under the Due Process Clause;

c.      Declare that MPP-Tamaulipas is unlawful;

d.      Set aside the decisions to return the Plaintiffs to Mexico pending their removal proceedings;

e.      Set aside MPP-Tamaulipas;

f.      Issue an injunction requiring Defendants to remove each of the Plaintiffs from MPP and allow each of them to return to the United States, with appropriate precautionary public health measures, and to pursue their removal proceedings from inside the country;

g.      In the alternative, if any Plaintiffs are not removed from MPP under the preceding paragraph, provide Plaintiffs with new nonrefoulement interviews, in accordance with applicable standards and procedures as identified by this Court, to determine if they face a likelihood of persecution or torture in Mexico and should therefore be removed from MPP;

h.      Award Plaintiffs their reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and,

i.      Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: April 14, 2020

Respectfully submitted,

 /s/ Celso J. Perez
Celso J. Perez (D.C. Bar No. 1034959)

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 160104)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800

Judy Rabinovitz*
Michael Tan*
Anand Balakrishnan*
Daniel A. Galindo*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

Andre Segura*
Edgar Saldivar*
Kathryn Huddleston*
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
(713) 942-8146

My Khanh Ngo*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770

Rochelle M. Garza*
ACLU Foundation of Texas
P.O. Box 6087
Brownsville, Texas 78523
(956) 338-1603

Rebecca Smullin (D.C. Bar No. 1017451)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-7714

Anne Peterson*
Blaine Bookey*
Karen Musalo*
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

*Attorneys for Plaintiffs*
*Pro hac vice application forthcoming*