# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NORA AND HER MINOR SON, JOSE (by and through his mother) c/o American Civil Liberties Union, *et al.*, | ) ) ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) | Civil Action No. 20-0993 (ABJ) |
|  | ) |  |
| CHAD F. WOLF, Acting Secretary of the Department of Homeland Security in his official capacity, *et al.*, | ) ) ) ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

## MEMORANDUM OPINION

Plaintiffs are twenty-six asylum seekers – twelve adults and their fourteen minor children – who are awaiting the completion of asylum proceedings in the Mexican state of Tamaulipas. Compl. [Dkt. # 3] ¶ 1.  They all fled violence and persecution in their home countries and sought refuge in the United States.  Compl. ¶ 1.  Once they reached the border, the Department of Homeland Security returned plaintiffs to Mexico pursuant to the Migrant Protection Protocols, which require that asylum seekers be returned to the territory from which they came from pending adjudication of their requests.  Compl. ¶¶ 3–4.  The complaint alleges that the decision to expand the implementation of this policy to include the entry points bordering Tamaulipas was unreasonable and unlawful; plaintiffs allege that they have endured – and continue to endure – extreme physical violence there.  Compl. ¶ 2.  They aver that have been assaulted, kidnapped, raped, extorted, and threatened by members of organized groups that control the area.  Pls.'

Declarations, Ex. 1 to Compl. [Dkt. # 3-2] (SEALED) ("Pls.' Decls.").  Plaintiffs contend that the federal government is well-aware of the violence that migrants face in Tamaulipas, Compl. ¶ 5; they point out that the region has been assigned the U.S. State Department's highest level "Do Not Travel" advisory "due to crime and kidnapping."  Compl. ¶¶ 39–40.

On April 16, 2020, plaintiffs filed this lawsuit, claiming that the Department of Homeland Security and its Acting Secretary, Chad F. Wolf, violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), in expanding the Migrant Protection Protocols to include Tamaulipas; that the policy and the government's decision to return these plaintiffs violates their substantive due process rights; and that the return decisions were not adjudicated appropriately.  Compl. ¶¶ 105–21.  On May 2, 2020, plaintiffs filed a motion for a preliminary injunction, requesting that they be returned to the United States during the pendency of this litigation.  Pls.' Mot. for Prelim. Inj. [Dkt. # 18] ("Pls.' Mot."); Pls.' Redacted Mem. of P. & A. in Supp. of Mot. for Prelim. Inj. [Dkt. # 18-2] ("Pls.' Mem.") at 1, 4.  Defendants opposed the motion on May 8, 2020.  Defs.' Mem. of P. & A. in Opp. to Pls.' Mot. [Dkt. # 23-2] (SEALED); Defs.' Redacted Mem. of P. & A. in Opp. to Pls.' Mot. [Dkt. # 34] ("Defs.' Mem.").  In opposition to the motion, defendants argued, among other things, that plaintiffs could not demonstrate a likelihood of success on the merits since the Court lacked jurisdiction to hear their claims.  Defs.' Mem. at 22–30, 35–37.

For the reasons set forth in more detail below, the motion for preliminary injunctive relief will be granted in part and denied in part.  Defendants have pointed to a statutory provision that precludes judicial review of individual, discretionary deportation decisions, Defs.' Mem. at 29–30; *see* 8 U.S.C. § 1252(a)(2)(B)(ii), and the portions of the complaint that seek such relief must be dismissed pursuant to Federal Rule of Civil Procedure 12(h)(3).  But there are some claims in the complaint that will go forward.  Claim One alleges that the defendants' broadly applicable

decision to expand the Migrant Protection Protocols to Tamaulipas was arbitrary and capricious, Compl. ¶¶ 105–08, and the Court has jurisdiction to hear it under the APA notwithstanding section 1252 of the Illegal Immigration Reform and Immigrant Responsibility Act.   The Court has jurisdiction to consider Claim Two to the extent it challenges the constitutionality of the expansion of MPP to Tamaulipas, as opposed to the MPP generally.  *See* Compl. ¶¶ 109–14.  Claim Three directly challenges the merits of the decisions to return each of the plaintiffs to Mexico notwithstanding their expressions of fear in *nonrefoulement* interviews, Compl. ¶¶ 115–21, and it falls under the statutory prohibition except to the extent that it alleges that some plaintiffs received no *nonrefoulement* interview at all.

Assuming that plaintiffs have demonstrated that they risk irreparable harm if they remain in Tamaulipas, the Court must consider whether they have carried their burden to show that they are likely to succeed on the merits of the claims over which it has jurisdiction.  Based on the complaint and the evidence adduced so far, the Court cannot determine whether plaintiffs are likely to succeed on the merits of Claim One since it has not been provided with records that memorialize the agency's decision or any administrative record underlying the alleged decision. Therefore, the Court will consolidate consideration of the motion for preliminary injunction with expedited consideration of Claim One on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). The Court finds that plaintiffs have not shown that they are likely to succeed on the merits of Claim Two given the lack of authority to support the extension of the state-created danger doctrine to the immigration context. But the Court will order that any plaintiffs who were returned to Mexico without *nonrefoulement* interviews as alleged in the surviving portion of Claim Three must receive an interview by July 2, 2020.

3

## BACKGROUND

### I.   The Migrant Protection Protocols

On December 20, 2018, the Department of Homeland Security ("DHS") introduced the Migrant Protection Protocols ("MPP"), which require that certain noncitizens who enter the United States directly from, or by travelling through Mexico, "illegally or without proper documentation," must be "returned to Mexico for the duration of their immigration proceedings."   Compl. ¶ 29; Dec. 20, 2018 Migrant Protection Protocols Announcement, Ex. 1 to Declaration of Darlene Barballianiz Boggs [Dkt. # 18-14] ("MPP Announcement").  The protocols were issued pursuant to a provision in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1225(b)(2)(C) (hereinafter, "contiguous territory provision"), which states:

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

*See* Jan. 25, 2019 Policy Guidance for Implementation of the Migrant Protection Protocols, Ex. 3 to Defs.' Mem. [Dkt. # 34-3] ("Jan. 25 MPP Policy Guidance").

The announcement that accompanied the adoption of the protocols asserts that they were issued because the United States "has an overwhelming asylum backlog of more than 786,000 pending cases," and "[m]ost of these claims are not meritorious."  MPP Announcement at 2. Therefore, DHS proclaimed, to prevent "aliens . . . [from] exploit[ing] asylum loopholes" and from "disappear[ing] into the United States," asylum seekers must await the processing of their applications in Mexico, and if they are granted asylum, they will then be allowed to enter the country. *Id.*

The same day the United States announced the MPP, the government of Mexico also issued a statement declaring that it would allow "temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry" and "ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international treaties to which Mexico is a party, and its Migration Law."  Jan. 25 MPP Policy Guidance at 1–2.

Individuals subject to the MPP undergo removal proceedings under 8 U.S.C. § 1229(a), and they are ordered to appear at immigration hearings at a U.S. port of entry on a future date. Compl. ¶ 30.  Then, they are physically returned to Mexico, and on the date of their hearing, they must report to their designated port of entry to be processed by Customs and Border Patrol ("CBP") and transported to the hearing site.  *Id.* ¶¶ 30–31.  After the hearing, they are transported back to the port of entry and returned to Mexico.  This process continues for as many hearings as are necessary to conclude the individual's immigration proceedings.  *See* Jan. 28, 2019 MPP Guiding Principles, Ex. 2 to Defs.' Mem. [Dkt. # 34-2] ("Jan. 28 MPP Guiding Principles") at 2.

Consistent with the principle of *nonrefoulement*, which precludes a State from expelling or returning a refugee "to the frontiers of territories where his [or her] life or freedom would be threatened on account of his [or her] race, religion, nationality, membership of a particular social

group or political opinion,"[1] United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150, the MPP are not supposed to apply to any individual who is "more likely than not to face persecution or torture in Mexico." Jan. 28 MPP Guiding Principles at 2. Thus, "where an alien affirmatively states a concern that he or she may face a risk of persecution on account of a protected ground or torture upon return to Mexico," U.S. Citizenship and Immigration Services ("USCIS") "will conduct an assessment" to determine whether application of the MPP is appropriate. Jan. 28, 2019 MPP Guidance for Implementing Section 235(b)(2)(C) of the INA, Ex. 2 to Declaration of Darlene Barballianiz Boggs [Dkt. # 18-15] ("Jan. 28 Policy Memo.") at 3.

That assessment is referred to by plaintiffs as a "*nonrefoulement* interview." *See, e.g.*, Compl. ¶ 9. These interviews are meant to be conducted in a "non-adversarial manner, separate and apart from the general public." Jan. 28 Policy Memo at 3. "The purpose of the interview is to elicit all relevant and useful information bearing on whether the alien would more likely than not face persecution on account of a protected ground, or torture, if the alien is returned to Mexico pending the conclusion of the alien's [asylum] proceedings." *Id.* The officer conducting the

---

1      While the United States is not a party to the 1951 Convention Relating to the Status of Refugees, it is a party to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267, which incorporates the 1951 convention's prohibition on *refoulement*. In addition, the United States is a signatory of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, 1465 U.N.T.S. 85 ("CAT"), which states: "No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Id.* at art. 3, ¶ 1. CAT was implemented in U.S. law by the  Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (codified at 8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

interview takes into account "[t]he credibility of any statements made by the alien," whether "residing in another region of Mexico to which the alien would have reasonable access could mitigate against the alleged harm," "[c]ommitments from the Government of Mexico regarding the treatment and protection of aliens," and "[w]hether the alien has engaged in criminal, persecutory, or terrorist activity." *Id.* at 4.

On January 28, 2019, the government began implementing section 235(b)(2)(C) of the INA through the MPP at the San Ysidro port of entry, located in San Diego, California, with the understanding that implementation would be expanded in the near future. Compl. ¶ 34; Jan. 28, 2019 Memorandum from Kevin K. McAleenan, Commissioner of CBP to Todd C. Owen, Executive Assistant Commissioner of CBP, Implementation of the MPP, Ex. 3 to Declaration of Darlene Barballianiz Boggs [Dkt. # 18-16] ("Jan. 28 MPP Implementation Memo") ("MPP expansion beyond . . . San Ysidro is coordinated closely with my office."); *see also* Jan. 28 MPP Guiding Principles.[2]

The complaint alleges that in March 2019, DHS "expanded MPP" to the Calexico, California and El Paso, Texas ports of entry.  Compl. ¶ 35.

On June 7, 2019, the United States issued a U.S.-Mexico Joint Declaration, stating that "[t]he United States will immediately expand the implementation of the existing Migrant

---

2       On April 8, 2019, the Northern District of California issued a nationwide preliminary injunction enjoining the continued implementation of the MPP.  *See Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1130–31 (N.D. Cal. 2019).  The court found that plaintiffs were likely to succeed on their claim that the MPP, as applied to a particular class of plaintiffs, were in violation of the APA and the INA.  *Id*. at 1121–28.  The Ninth Circuit affirmed the injunction, *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1095 (9th Cir. 2020), petition for cert. filed, 88 U.S.L.W. 3339 (U.S. Apr. 10, 2020), but it has since been stayed by the Supreme Court pending petition for certiorari.  *Wolf v. Innovation Law Lab*, No. 19A960, 2020 WL 1161432, at *1 (U.S. Mar. 11, 2020).

Protection Protocols across its entire Southern Border."   June 7, 2019 U.S.-Mexico Joint Declaration Media Note, Ex. 1 to Defs.' Mem. [Dkt. # 34-1] at 2.  Plaintiffs allege that in July of 2019, DHS expanded the MPP to the Mexican border state of Tamaulipas.   Compl. ¶¶ 5, 36. Individuals entering the United States through the ports of entry in Laredo, McAllen, or Brownsville, Texas are returned through these ports to Tamaulipas.  *Id.* ¶ 36.

## II.    Factual Background

Plaintiffs are migrants from Central and South American countries with pending asylum applications who were returned to Tamaulipas under the MPP.  While awaiting the outcome of their asylum proceedings in Tamaulipas, plaintiffs have been kidnapped, raped, assaulted, threatened, sexually assaulted, extorted, imprisoned, robbed, and attacked.  Compl. ¶¶ 15–25; *see generally* Pls.' Decls.  Plaintiffs have been unable to seek protection from the Mexican police, Compl. ¶ 73, and they allege that they live in constant fear of additional similar attacks.  Compl. ¶ 2.

Several plaintiffs expressed fears of returning to Mexico when they were first processed at the border.  Compl. ¶ 88.  CBP did not refer them to USCIS for *nonrefoulement* interviews, as it was required to do, and it returned them to Tamaulipas instead.  Compl. ¶ 88.  Eventually, all of the plaintiffs except for one received interviews when they returned to the port of entry for a hearing.  Compl. ¶¶ 78–79.  Not one plaintiff who was interviewed was found to have satisfied the "more likely than not" standard; in each case, a finding was made that the individual had not made a sufficient showing.   Compl. ¶ 91.  Plaintiffs allege that the hearings were not conducted in

accordance with the applicable procedures, and that the migrants were prevented from fully sharing their experiences or submitting evidence.  Compl. ¶¶ 94–104.

In their complaint, plaintiffs highlight the government's own statements about the dangers of Tamaulipas.  Since at least 2018, the U.S. Department of State has assigned the Mexican state a "Level 4: Do Not Travel" advisory.  Compl. ¶ 39.  This is the Department's highest level of warning, typically assigned to active-combat zones such as Afghanistan, Iraq, and Syria.  *Id.*  Until coronavirus-related travel advisories were issued, plaintiffs assert that Tamaulipas was the only Mexican border state with a Level 4 advisory.  Compl. ¶ 41.  It warns:

> Do not travel due to crime and kidnapping.
>
> Violent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common. Armed criminal groups target public and private passenger buses as well as private automobiles traveling through Tamaulipas, often taking passengers hostage and demanding ransom payments. Federal and state security forces have limited capability to respond to violence in many parts of the state.

U.S. Dep't of State, Mexico Travel Advisory, *available at* https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (Apr. 9, 2019) ("April 2019 Mexico Travel Advisory").  Indeed, the State Department advises that anyone traveling to such a high-risk area should create a will, designate a family member to negotiate with kidnappers, and establish secret questions and answers to verify that the traveler is still alive when kidnappers reach out to family.  U.S. Dep't of State, High-Risk Area Travelers, *available at* https://travel.state.gov/content/travel/en/international-travel/before-you-go/travelers-with-special-considerations/high-risk-travelers.html (last updated Nov. 6, 2019).

The Mexican government has similarly recognized the dangers associated with this region.  For example, according to the complaint, the Mexican ambassador to the United States

acknowledged that her government had not been prepared for the expansion of MPP to Tamaulipas, given challenges associated with security.   Compl. ¶ 46, citing CQ Newsmaker Transcripts, *CQ Roll Call and the Meridian International Center Holds Discussion on Trade, Immigration and Foreign Affairs*, (Jul. 18, 2019), Ex. 21 to Pls.' Mot. [Dkt. # 18-34], quoting Ambassador Martha Bárcena Coqui ("[W]e recognize there are certain areas of Mexico in which the challenges of security are higher. So, that is why we have been very careful of not opening up, for example, the return in Tamaulipas . . . ."); *see also* Kevin Sieff, *When They Filed Their Asylum Claim, They Were Told To Wait in Mexico.  There, They Say, They Were Kidnapped*, Wash. Post., (June 9, 2017), Ex. 26 to Declaration of Darlene Barballianiz Boggs [Dkt. # 18-39] (reporting a statement from a Mexican legislator stating that the lives of migrants were in danger and that the State does not have the capacity to protect them).

Plaintiffs contend that asylum seekers who are sent to Tamaulipas to wait out their immigration proceedings have no choice but to be exposed to the violence in the region. Individuals who are processed under the MPP are dropped off at bridges connecting ports in Texas to cities in Tamaulipas.  Compl. ¶ 53.  Individuals with proceedings underway must report to these bridges, where they are then picked up by DHS agents for their hearings.  *See* Compl. ¶ 54.  These locations are well-known, and plaintiffs assert that many asylum applicants are kidnapped within moments of their return to Mexico.  Compl. ¶ 53.  In addition, migrants can be ordered to present themselves at the pick-up locations very early in the morning, sometimes as early as 4:30 AM. Compl. ¶ 54.  Plaintiffs allege that reporting "essentially in the middle of the night" is especially dangerous, Compl. ¶ 54:  the State Department imposes a curfew on U.S. government employees in these areas between midnight and 6:00 am because of the risks.  April 2019 Mexico Travel Advisory.  And, "[b]ecause immigration proceedings require multiple hearings over a period of

many months, individuals are repeatedly subjected to the danger of being dropped off at the bridges." Compl. ¶ 56.

Plaintiffs further allege that the dangerous nature of the region hinders individual asylum applications: lawyers are afraid to travel to Tamaulipas to meet with asylum seekers, and many applicants receive removal orders *in absentia* because they are too afraid to attend their hearings. Compl. ¶ 57.

### III.    Procedural Background

On April 16, 2020, twenty-six plaintiffs proceeding under pseudonyms filed a complaint against the DHS and Chad F. Wolf, Acting Secretary of DHS, that included three claims:

1) Defendants' decision to expand the MPP to Tamaulipas was arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2), because DHS knew that migrants would face extreme levels of violence there. Compl. ¶¶ 105–08. Plaintiffs also allege that defendants failed to engage in reasoned decision-making because they have not supplied any explanation for their action. Compl.¶ 108.

2) Defendants violated the Due Process Clause of the Fifth Amendment to the U.S. Constitution by knowingly placing plaintiffs in danger so serious and egregious that it shocks the conscience. Compl. ¶¶ 109–14.

3) Defendants violated the APA, 5 U.S.C. § 706(2) and the *Accardi* doctrine because they failed to follow their own regulations when conducting the *nonrefoulement* interviews for individuals returned to Tamaulipas under the expanded MPP. Compl. ¶¶ 115–21. Plaintiffs also alleged that one of them did not receive an interview at all. Compl. ¶¶ 117–18.

On May 2, 2020, plaintiffs filed a motion for a preliminary injunction, requesting an order that they be permitted to return to the United States for the pendency of the litigation, or at least an order that they be promptly provided with *nonrefoulement* interviews to be adjudicated under the proper standard. Pls.' Mem. at 45 n.24. The government opposed the motion on May 8, 2020. Defs.' Mem.

11

## STANDARD OF REVIEW

A preliminary injunction "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011), quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

The decision to issue a preliminary injunction turns on four factors:  whether (1) plaintiffs are likely to succeed on the merits of the action; (2) plaintiffs will suffer irreparable harm absent an injunction; (3) the balance of the equities tips in the plaintiffs' favor; and (4) an injunction is in the public interest.  *See Winter*, 555 U.S. at 20; *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019).  The last two factors merge when the government is the opposing party.  *Guedes*, 920 F.3d at 10.  Preliminary injunctive relief "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The manner in which courts should weigh the four factors "remains an open question" in this Circuit.  *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). The Court of Appeals has long adhered to the "sliding scale" approach, where "a strong showing on one factor could make up for a weaker showing on another."  *Sherley*, 644 F.3d at 392.  But its more recent decisions call that into question.

The Supreme Court has not addressed the precise question of whether a particularly strong showing of harm would suffice in the face of a weaker showing on the merits. But because the Supreme Court's decision in *Winter* "seemed to treat the four factors as independent requirements," the Court of Appeals has "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Id.* at 392–93, quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009)

(Kavanaugh, J., concurring). And although the Court of Appeals has not specifically clarified whether the "'sliding scale' approach remains valid after *Winter*," *League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016), it has ruled that a failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary injunction. *See Ark. Dairy Co-op. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006).

Regardless of whether the sliding scale framework applies, it remains the law in this Circuit that a movant must demonstrate irreparable harm, which has "always" been "the basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974), quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959) (internal edits omitted). A failure to show irreparable harm is grounds for the Court to refuse to issue a preliminary injunction, "even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## ANALYSIS

### I.    Jurisdiction

Defendants argue that section 1252(a)(2)(B)(ii) of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") prohibits the Court from reviewing plaintiffs' claims. Defs.' Mem. at 22. The provision states:

> (B)    **Denials of discretionary relief** - Notwithstanding any other provision of law (statutory or nonstatutory), . . . no court shall have jurisdiction to review—
>
> > (ii)    any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii).

Defendants argue that the ban on judicial review applies in this case because the statute specifically accords the Secretary the discretion to return an alien to the territory from which he or she arrived pending a section 1229a proceeding.  Defs.' Mem. at 22–23.  8 U.S.C. § 1225(b)(2)(C) states:

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(C).  In other words, since a return decision is left to the discretion of the Secretary, a court cannot review it.  Defs.' Mem. at 22–23; *see Zhu v. Gonzales*, 411 F.3d 292, 294–96 (D.C. Cir. 2005) (finding that a statute using the word "may" conferred discretion to the attorney general, and thus the decisions made under that statute were unreviewable pursuant to section 1252(a)(2)(B)(ii)).

Claim One alleges that defendants' decision to expand the MPP to Tamaulipas was arbitrary and capricious given the known dangers in the region.  Compl. ¶ 106.  Defendants maintain that the claim is precluded because, in essence, it challenges the agency's exercise of its discretion to return the individual plaintiffs.  Defs.' Mem. at 22–27.

But Claim One does not take on the individual decisions made to return each plaintiff to Mexico; it is directed at an agency decision – the decision to "expand" MPP implementation to Tamaulipas – that applies to migrants arriving from Mexico at three Texas points of entry.  *See Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir. 2016) (differentiating between a discrete agency action and the broader ongoing policy underlying that action).  Defendants do not point to any specific provision in the INA specifying that a decision to expand protocols implementing

section 1225(b)(2)(C) is discretionary.   Thus, the claim does not fall within section 1252(a)(2)(B)(ii), and the Court may consider Claim One.[3]

Claim Two alleges that defendants engaged in affirmative conduct they knew or should have known would expose asylum seekers to the risk of grave danger.  Compl. ¶ 110.  This general allegation is followed by a more particularized one: that defendants have forced each of the plaintiffs to remain in Tamaulipas "despite [d]efendants' knowledge of the severe harms that plaintiffs have experienced and the continuing serious and obvious risk . . . ."  Compl. ¶ 111.  Paragraph 114 of the complaint concludes, "[d]efendants have violated [p]laintiffs' due process rights both by adopting and applying MPP-Tamaulipas, and additionally by subjecting and continuing to subject [p]laintiffs to MPP-Tamaulipas."  Compl. ¶ 114.  This claim is something of a hybrid; to the extent it claims, as in paragraph 111, that the defendants were aware that these particular plaintiffs had already suffered harm in the Mexican state but returned them anyway, it asks the Court to review individual discretionary decisions made in the application of the MPP, and the Court lacks jurisdiction to do so.  But to the extent Claim Two challenges the allegedly unconscionable nature of the decision to implement the MPP in Tamaulipas at all, that is not a

---

3       Defendants cite *Cruz v. Dep't of Homeland Sec.*, No. 19-CV-2727, 2019 WL 8139805, at *6 (D.D.C. Nov. 21, 2019) in support of their argument, but *Cruz* actually supports jurisdiction for Claim One.  That court found that it could not review a specific challenge to the Attorney General's discretionary choice to remove the plaintiff back to Mexico.  But, the court found that section 1252(a)(2)(B) did not preclude review of the plaintiff's APA claims challenging the procedures employed in promulgating the MPP.  *Id.* at *4.

decision committed to the discretion of the Attorney General by statute, and the Court has the power to consider the constitutional question.[4]

Finally, Claim Three states that defendants failed to properly adjudicate the plaintiffs' *nonrefoulement* interviews in violation of the APA.  Compl. ¶¶ 115, 117–18.  They also allege that one plaintiff did not receive the required interview at all, even though she too expressed a fear of returning to Mexico.  Compl. ¶ 117.

The allegation that the defendants failed to properly "adjudicate," that is, to make an official decision about, plaintiffs' *nonrefoulement* requests is a clear attack on the merits of the return decisions.  Plaintiffs make clear that they are attacking the legitimacy of the individual,

---

[4]     Defendants note in their opposition that other circuit courts have held that constitutional claims are unreviewable under this statute.  Defs.' Mem. at 29–30.  But the cases they cite are not so broad; those opinions held that the particular constitutional claims before them could not be reviewed because they were specifically aimed at discretionary decisions.  *See Polfliet v. Cuccinelli*, 955 F.3d 377, 384 (4th Cir. 2020) ("8 U.S.C. § 1252(a)(2)(B)(ii) strips courts of jurisdiction to review" "constitutional claims" challenging discretionary "decisions"); *Privett v. Sec'y of Dep't of Homeland Sec.*, 865 F.3d 375, 381 (6th Cir. 2017) ("The Secretary's decision not to make an exception for Privett is an element of these constitutional and statutory claims. In fact, it is the very thing challenged as causing the constitutional harm or applying the statute improperly. Accordingly, in order to adjudicate these claims, we would be required to give the Secretary's decision not to grant his petition a central role in our review.  Because such review is proscribed by § 1252(a)(2)(B)(ii), we do not have jurisdiction over the constitutional and retroactivity claims."); *Jilin Pharmacy USA v. Chertoff*, 447 F.3d 196, 206 (3d Cir. 2006) ("Because evaluating these constitutional claims requires us to revisit and review the Attorney General's exercise of discretion . . . we lack the jurisdiction to consider them."); *Dave v. Ashcroft*, 363 F.3d 649, 653 (7th Cir. 2004) ("[T]he decision when to commence deportation proceedings is within the discretion of the Attorney General and does not, therefore, involve a protected property or liberty interest.").  Here, the Court need not review the decision to return any particular plaintiff to assess the lawfulness of the expansion of the MPP to Tamaulipas. Plaintiffs are challenging the policy itself, and courts have held that those claims are reviewable under the INA.  *See Mantena v. Johnson*, 809 F.3d 721, 728 (2d Cir. 2015) (holding that the statue "does not strip jurisdiction over procedural challenges," but it "strips jurisdiction over a substantive discretionary decision"); *Kwai Fun Wong v. United States*, 373 F.3d 952, 963 (9th Cir. 2004) (finding that the plaintiff's constitutional claims did not challenge any discretionary decision, and so the Court could review the claims under section 1252(a)(2)(B)).

discretionary determinations in their motion for a preliminary injunction; they complain that "despite [their] credible accounts of being raped, assaulted, and subjected to repeated death threats in Tamaulipas, [d]efendants did not find that *any* of them had established the requisite fear to remove them from MPP." Pls.' Mem. at 32. The declarations submitted to the Court in support of the motion include individual accounts of "past persecution in Tamaulipas on account of a protected ground," and plaintiffs argue that "they should have been presumed to face a future threat of persecution." *Id.* at 32–33. In other words, plaintiffs are contesting the outcome of their *nonrefoulement* interviews. While the allegation that the interview has become a hollow exercise that offers asylum seekers little protection is deeply troubling, the Court is required by law to conclude that Claim Three questions discretionary decisions that it lacks the jurisdiction to review.

Plaintiffs argue, though, that even if the Court construes Claim Three to be challenging the return decisions themselves, section 1252(a)(2)(B)(ii) does not preclude judicial review. They submit that the provision "only restricts review of discretionary denials of relief concerning admission or removal," Pls.' Reply in Supp. of Pls.' Mot. (REDACTED) [Dkt. # 36] ("Pls.' Reply") at 5, and that "an individual decision to 'return' an individual to Mexico during the course of immigration proceedings is not a decision about whether that person can legally be admitted to the country or should be removed." *Id.* at 6.

Plaintiffs' argument is that the operative subparagraph – section 1252(a)(2)(B)**(ii)** – cannot be understood unless it is read within the context of paragraph (B) in its entirety. The IIRIRA provision in question states:

(B)     **Denials of discretionary relief** - Notwithstanding any other provision of law (statutory or nonstatutory), . . .  no court shall have jurisdiction to review—

(i)     any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, **or**

(ii)     any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(B).

According to the plaintiffs, paragraph (B)(ii) is a "catchall or residual clause that should be interpreted as limited by the enumerated categories . . . which are recited just before it."[5]  Pls.' Reply at 5.  Applying that principle, they reason that because all of the statutes listed in (B)(i) involve substantive decisions regarding whether an individual may stay in the country, the catchall provision  should be construed to refer only to similar decisions, and, they say, returning an asylum seeker under the MPP is not one of these types of decisions.  *Id*. at 5–6.

Plaintiffs point to the Supreme Court's opinion in *Kucana v. Holder*, 558 U.S. 233 (2010), which examined the relationship between the two subsections.  In that case, the "discretionary decision" at issue was one made by the Board of Immigration Appeals ("BIA") to deny a motion to reopen removal proceedings.  The discretion to deny such a motion was derived from a federal regulation, not a statute, and the Court found that (B)(ii) did not contemplate discretionary

---

5       Plaintiffs are invoking the statutory canon of *ejusdem generis*, which provides that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those enumerated by the preceding specific words."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) (where the statute stated that "nothing herein shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," the residual clause at the end of that list was informed by the two preceding categories of workers).

decisions set forth in federal regulations.  It relied, in part, on a consideration of subsection (B)(i); the Court stated that it was instructive in determining the meaning of (B)(ii) that Congress had in mind "decisions of the same genre, i.e., those made discretionary by legislation."  *Id.* at 246–47. The Court also found "significant the character of the decisions Congress enumerated in section 1252(a)(2)(B)(i)" which were "substantive decisions . . . made by the Executive in the immigration context as a matter of grace, things that involve whether aliens can stay in the country or not."  *Id.* at 247.  Because a motion to reopen a case "does not direct the Executive to afford the alien substantive relief" and is merely a "procedural device" that "concerns only the question whether the alien's claims have been accorded a reasonable hearing," the Court was not precluded from reviewing the BIA's decision to deny the motion to reopen by (B)(ii).  *Id.* at 248.

Plaintiffs argue that the decision to remove an individual from the United States under the MPP is an "adjunct" decision, similar to a decision denying a motion to reopen proceedings, and it does not afford the alien substantive relief.  Pls.' Reply at 6.  But the Court concludes, as others have, that while the return determination under the MPP may be a merely interim decision regarding the status of an alien, the ruling is not simply a "procedural" decision like the one in *Kucana*.  Rather, it is a decision that entails the substantive evaluation of the non-citizen's fear of return, and it plainly "involve[s] whether aliens can stay in the country or not."  *Kucana*, 588 U.S. at 247.  Moreover, the main focus of the *Kucana* decision was whether (B)(ii) precluded judicial review when discretion was conferred by regulation as opposed to by statute.  Here, discretion is conferred by statute, and therefore, the decision to return an alien to Mexico pending further proceedings falls within the scope of section 1252(a)(2)(B)(ii).  *See Cruz*, 2019 WL 8139805, at *4 (finding individual return decisions unreviewable under section 1252(a)(2)(B)(ii)); *see also E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 191 (3d Cir. 2020) (finding that

19

section 1252(a)(2)(B)(ii) did not preclude judicial review over plaintiffs' claims because they did not seek review of the Attorney General's exercise of discretion, rather, they challenged the extent of the Attorney General's authority under the statute); *Innovation Law Lab*, 366 F. Supp. 3d at 1118, *aff'd sub nom. Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020) (recognizing that DHS's "decisions to return or not return any particular alien . . . might not be subject to review," but finding that plaintiffs' claims were justiciable because plaintiffs were challenging the applicability of the contiguous territory provision to them, not the return decisions themselves).

Thus, the Court finds that it does not have jurisdiction over Claim Three to the extent that it challenges the adjudication of the *nonrefoulement* interviews.  However, the Court finds that it can review the decision not to grant plaintiff Diana a *nonrefoulement* interview at all, since that was not a choice the Attorney General was accorded the discretion to make.

The MPP Guiding Principles issued by DHS in January of 2019 state:

- "If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien *will be* referred to a USCIS asylum officer for screening following the affirmative statement of fear of persecution or torture in, or return to, Mexico, so that the asylum officer can assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico."  Jan. 28 MPP Guiding Principles at 1–2.

- "If USCIS assesses that an alien who affirmatively states a fear of return to Mexico is more likely than not to face persecution or torture in Mexico, the alien *may not* be processed for MPP.  Officers retain all existing discretion to process (or re-process) the alien for any other available disposition, including expedited removal, NTA, waivers, or parole."  *Id.* at 2.

The government is bound to follow its own procedures, and a failure to follow those procedures is not immune from judicial review because it is not a discretionary decision.  *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 327 (D.D.C. 2018) (finding that section 1252(a)(2)(B)(ii) did not apply

because the plaintiffs were not challenging the outcome of the agency's decision making, but the method by which the policy was being applied).  Here, plaintiff Diana was subject to the MPP without being afforded the proper procedures.  Thus, the Court may review her claim.

Because the Court has jurisdiction to review at least some parts of all three claims, the Court will go on to assess the likelihood of success on the merits and the other preliminary injunction factors.

**II.   The Court will consolidate the motion for preliminary injunctive relief with expedited consideration of the merits of Claim One.**

Plaintiffs allege that the decision to expand implementation of the MPP to Tamaulipas was arbitrary and capricious because they exposed asylum seekers to a known risk of serious harm. Compl. ¶¶ 36, 47, 106; *see also* Pls.' Mem. at 21–24 (defendants did not offer any plausible explanation for the choice, and they failed to consider the risk of danger to the migrants). Defendants respond that the "relevant inquiry" to evaluate this claim "is not whether DHS acted arbitrarily or capriciously '[i]n expanding MPP to Tamaulipas, but rather . . . whether the individual asylum officers' determinations in question were rational" in light of the contiguous territory provision, which gives DHS the authority to return aliens "arriving on land . . . from a foreign territory contiguous to the United States . . . to *that* territory."  Defs.' Mem. at 27, citing 8 U.S.C. § 1225(b)(2)(C).  Defendants emphasize that DHS was implementing a statute that permits the return of aliens who come from a foreign contiguous country to that country.  They point out that the plaintiffs came to the United States through Tamaulipas, and they submit that

therefore, it could not have been unreasonable to carry out the statutory scheme by sending them back.

But plaintiffs are not challenging the government's decision to return them to *Mexico*; this lawsuit takes on the agency's decision to expand its implementation of the statute to the state of Tamaulipas.  The defense points to selected interviews in which at least some of the plaintiffs failed to identify another place it would be safer to go, and it maintains that the decision to return *them* isn't arbitrary and capricious.  Defs.' Mem. at 27–28.  This is simply the jurisdictional argument restated.  The Court has already concluded that defendants have mischaracterized the complaint, and that complaint is indeed asking it to assess the reasonableness of a broad policy decision and not the individual asylum officers' determinations.

Since plaintiffs focused their evidentiary presentation on the question of irreparable harm and the deficiencies of the *nonrefoulement* interviews, and defendants declined to address the alleged expansion directly at all, the Court has little before it that would enable it to determine, based on this record, whether plaintiffs have carried their burden to demonstrate the likelihood that they will succeed on the merits of the APA claim.  So, the Court will defer ruling on the motion until it has had the benefit of the necessary materials.  The complaint details what was known to – and announced by – some agencies within U.S. government about Tamaulipas, and it gives rise to serious questions about whether it would be reasonable for DHS to require asylum seekers to stay there for an indefinite period of time, even if their route to the United States took them through that territory. But the Court has not yet been provided with records memorializing the actual decision or the reasons behind it; nor has it seen any material comprising an administrative record that could reveal what facts were known to or considered by the decision makers, and what risks

were evaluated or ignored.[6]  Therefore, the parties will be ordered to meet and confer and propose

a schedule for the expedited creation of an administrative record and the briefing of dispositive

motions.

### III.     Plaintiffs have not shown that they are likely to succeed on Claim Two.

Plaintiffs allege that when defendants expanded the MPP to Tamaulipas, they violated

plaintiffs' Fifth Amendment substantive due process rights.  The concept of substantive due

process embodies the recognition that the Constitution "forbids the government to infringe certain

'fundamental' liberty interests . . .  no matter what process is provided, unless the infringement is

narrowly tailored to serve a compelling state interest."  *Reno v. Flores*, 507 U.S. 292, 301–02

(1993).  "To succeed on a substantive due process claim, a plaintiff must prove 'egregious

government misconduct' that deprives him of a liberty or property interest."  *Bellinger v. Bowser*,

288 F. Supp. 3d 71, 85 (D.D.C. 2017), citing *George Washington Univ. v. District of Columbia*,

318 F.3d 203, 206 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003) (holding that substantive due

process imposes no burden on the government "in the absence of a liberty or property interest").

"[T]he plaintiff must also show that the . . . conduct was 'so egregious, so outrageous, that it may

fairly be said to shock the contemporary conscience.'"  *Butera v. District of Columbia*, 235 F.3d

637, 651 (D.C. Cir. 2001), quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n.8 (1998).

The "[s]ubstantive due process analysis must begin with a careful description of the asserted right,

for [t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are

---

6       For example, the Court notes that in the Memorandum referred to in paragraph 34 of the
complaint, the Commissioner of CPB stated: "MPP implementation will begin at the San Ysidro
port of entry on January 28, 2019, and it is anticipated that it will be expanded in the near future.
Please ensure that each stage of MPP expansion beyond OFO implementation at San Ysidro is
coordinated closely with my office."   Jan. 28, 2019 MPP Implementation Memo. at 1.   This
suggests that there may be a record of decision making related to the expansion to Tamaulipas.

asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

Defendants argue that plaintiffs have not alleged a deprivation of a liberty or property interest, and they rely on authority that states, "an applicant for initial entry has no constitutionally cognizable liberty interest in being permitted to enter the United States." *Rafeedie v. INS,* 880 F.2d 506, 520 (D.C. Cir. 1989); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953) ("Aliens seeking entry from contiguous lands obviously can be turned back at the border without more."). Plaintiffs do not dispute that legal principle. But plaintiffs point out that the second claim expressly alleges that they have been deprived of something else: their liberty interest in bodily security. *See* Compl. ¶¶ 109–112. According to the plaintiffs, the constitutional right at issue is protection from third-party violence, and that claim can be recognized under the state-created danger doctrine. *See* Pls.' Mem. at 25, quoting *Butera*, 235 F.3d at 654; *see also* Pls.' Reply at 15 ("Plaintiffs' substantive due process claim is that the state cannot, in a conscience-shocking way, increase their risk to deadly harm.").

In *Butera*, the D.C. Circuit explained that "[a]s a general matter, a State's failure to protect an individual from private violence, even in the face of a known danger, 'does not constitute a violation of the Due Process Clause.'" *Butera*, 235 F.3d at 647, quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189, 197 (1989). But the Court of Appeals has also recognized that in "certain limited circumstances, the Constitution may impose affirmative duties of care and protection with respect to particular individuals." *DeShaney*, 489 U.S. at 198 (where state authorities knew that a child's father was abusive, but did not take steps to remove the child from his father's custody, the Court found that the state's failure to provide the child with adequate protection against his father's violence did not violate the substantive due process clause).

One such circumstance is "where the state creates a dangerous situation or renders citizens more vulnerable to danger."[7]  *Butera*, 235 F.3d at 648–49, quoting *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993).  The state-created danger doctrine applies where "the State knowingly created or increased the risk that an individual would be exposed to danger."  *Butera*, 235 F.3d at 654.  In *Butera*, the plaintiff brought several claims under 42 U.S.C. § 1983, alleging violations of a number of constitutional rights when her son was killed while serving as an undercover operative for the Metropolitan Police Department ("MPD").  *Id.* at 640–41.  The plaintiff presented evidence that the police officers failed to advise her son of the risks of serving as an undercover operative and failed to put in place measures to ensure his safety.  *Id.* at 643–44.  The Court examined whether the District of Columbia and MPD officers could be held liable for failing to protect an individual who was not in custody from harm inflicted by a third party.  *Id.* at 641.  The Court held that they could under the state-created danger doctrine, but because this case was the first in the D.C. Circuit to deal with this issue, it held that the right was not clearly established when Eric was murdered, and the officers were entitled to qualified immunity.  *Id.* at 654.  Other circuits have also recognized this right in the section 1983 context.  *See Munger v. City of Glasgow*, 227 F.3d 1082, 1084–85 (9th Cir. 2000) (where the police ejected an intoxicated man wearing only a t-shirt and jeans from a bar on a very cold night and forced him to walk home, and he later died of hypothermia, the court found the district court erred when it granted the officers qualified immunity); *Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989) (police officer who stopped a car in which plaintiff was a passenger, arrested and removed the driver, impounded the car, and

---

7        Another circumstance arises when the State "takes a person into its custody and holds him there against his will," hence depriving him of liberty.  *Id.* at 199–200.

left the plaintiff in a high crime area could be liable for a substantive due process violation when she was raped on her way home).

Plaintiffs contend that defendants have created a dangerous situation and increased their vulnerability to danger by:  returning them to Tamaulipas; requiring them to appear at known kidnapping sites as early as 4:30 AM; returning them to the dangerous locations at the end of the day; and forcing them to repeat this process again and again for months while their cases are adjudicated.  Compl. ¶¶ 53–56; Pls.' Reply at 13, 16.

Plaintiffs have not pointed the Court to any opinion in which this circuit applied the state-created danger doctrine to a non-citizen in immigration proceedings.  The doctrine arose in proceedings under 42 U.S.C. § 1983 seeking to hold state actors liable for constitutional violations, and several circuits have expressly rejected the notion that it could be applied in the immigration context.  For example, in *Enwonwu v. Gonzales*, 438 F.3d 22, 29 (1st Cir. 2006), the First Circuit held:

> [T]here can be no *substantive* due process objection to the order removing [plaintiff].  The state-created danger theory argument fails because an alien has no constitutional substantive due process right not to be removed from the United States, nor a right not to be removed from the United States to a particular place.

The First Circuit relied on separation of powers principles, finding that "entertaining the state-created danger theory as means for relief from a removal order, a court, whether sitting in habeas or in judicial review, steps outside its defined constitutional role and intrudes into a realm reserved to the Executive and the Legislative Branches."  *Id.* at 30.

The Third Circuit came to a similar conclusion, stating that "[w]e are aware of no court of appeals which has recognized the constitutional validity of the state-created danger theory in the context of an immigration case.  We decline to do so here, and hold that the state-created danger

exception has no place in our immigration jurisprudence." *Kamara v. Attorney Gen. of U.S.*, 420 F.3d 202, 217 (3d Cir. 2005). The *Kamara* court reasoned that "[e]xtending the state-created danger exception to final orders of removal would impermissibly tread upon Congress' virtually exclusive domain over immigration, and would unduly expand the contours of our immigration statutes and regulations." *Id.* at 217–18; *see Paulino v. Attorney Gen. of U.S.*, 445 Fed. Appx. 558, 561 (3d Cir. 2011) (reaffirming the holding in *Kamara*); *see also Beibei Zhang v. Holder*, 358 Fed. Appx. 216, 218 (2d Cir. 2009) (citing to *Kamara* in "holding that the state-created danger doctrine does not apply in immigration proceedings."). The Tenth Circuit adopted the same reasoning, finding that the state-created danger doctrine should not be extended to the context of immigration review because that would effectively "judicially engraft a new form of relief from removal onto the statutory scheme established by Congress." *Vincent-Elias v. Mukasey*, 532 F.3d 1086, 1095 (10th Cir. 2008).

In the absence of clear direction from the D.C. Circuit on the issue, and in light of the persuasive reasoning of the three other circuits cited above, the Court cannot find that plaintiffs

have shown that they are likely to be successful on the merits of their constitutional claim.[8]

Therefore, the Court will deny plaintiffs' motion for preliminary injunction as to Claim Two.[9]

### IV. Plaintiffs have established that plaintiff Diana is likely to succeed on the surviving portion of Claim Three, and that the requested relief should be granted as to her.

Guidance issued by DHS provides that an individual who "affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico," will be referred for a *nonrefoulement* screening. *See* Jan. 28 MPP Guiding Principles at 1. One plaintiff, Diana, never received a *nonrefoulment* interview, although she told immigration officials that she feared

---

[8]    Even if the state-created danger doctrine applied in this context, plaintiffs face difficulties meeting the legal test for whether the government's conduct is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. There are two methods or proving the claim: a plaintiff must show that the defendant acted with "intent to harm" or "deliberate indifference." *Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1145–46 (D.C. Cir. 2004).

 The Court cannot find that plaintiffs have shown at this time that a claim under "intent to harm" standard will succeed because the complaint does not allege any facts that would support an inference that the government intended to harm plaintiffs when it expanded the MPP to Tamaulipas.

 The "deliberate indifference" standard "applies only in circumstances where the State has a heightened obligation toward the individual." *Id.* at 1145–46, citing *Butera*, 235 F.3d at 652. Because the government has required plaintiffs to remain in Tamaulipas or travel to Tamaulipas to attend their asylum hearings and assumed the role of transporting them from the border to their hearings, one could argue that it has undertaken a heightened obligation to ensure plaintiffs' safety. But the guiding principles implementing the MPP show that the government contemplated that migrants may fear remaining in Mexico, and it adopted procedures requiring a *nonrefoulement* interview for any person that expresses such a fear. Jan. 28 MPP Guiding Principles at 1–2. If the Asylum Officer determines that these fears are founded, they will not be processed under the MPP. *Id.* at 2. Such procedures run counter to the necessary finding that the agency has been indifferent to the risks, and it will be difficult for plaintiff to establish that they are likely to succeed on the merits on the record before it.

[9]    Where plaintiffs have not demonstrated a likelihood of success on the merits, the Court need not analyze the other preliminary relief factors. *Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009).

returning to Mexico.  Declaration of Diana, Ex. 1 to Compl. [Dkt. # 3-2] ("Diana Decl.")
(SEALED) at 70, ¶ 34.

Government agencies must follow their own rules, including agency procedures "[w]here
the rights of individuals are affected." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); s*ee United States
ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954); *accord Damus*, 313 F. Supp. 3d at
337.  This obligation extends even to unpublished measures intended to be binding.  *See Aracely
v. Nielsen*, 319 F. Supp. 3d 110, 150 (D.D.C. 2018).

Defendants argue that Diana has not shown that she is entitled to a *nonrefoulement*
interview because she claims only that she intended to express a fear and ask for help, but does not
state that she affirmatively articulated the fear.  Defs.' Mem. at 36–37.  But, Diana avers that her
family was subjected to an armed assault in Mexico, *see* Diana Decl. ¶¶ 21–27, and that when
immigration officials asked her to sign documents written in English, and stated that she would be
agreeing to leave for Mexico, "[t]hat is when I told them I was afraid of being in Mexico, which I
knew is as or more dangerous than my home country."  Diana Decl. ¶ 34.  She added, "I refused
to sign these documents because I did not understand them and I did not want to go back to
Mexico." Diana Decl. ¶ 36.

Because Diana articulated a fear of returning to Mexico and was not given a
*nonrefoulement* interview, in violation of the agency's procedures, she has demonstrated a
substantial likelihood of success on the merits.

Diana has also demonstrated that she would be likely to suffer irreparable injury if she and
her children were to remain in Mexico without being properly evaluated for a fear of persecution.
Diana has already been attacked and robbed, and her daughter has been kidnapped and raped
multiple times.  Compl. ¶ 21.  Others around them in the camp have had similar experiences, and

it is likely that they will continue to be targets of violence.  Thus, plaintiff Diana has shown that she is entitled to a preliminary injunction.

However, "[i]njunctive relief granted to a party in a lawsuit must be framed to remedy the harm claimed by the party." *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976).  The injunction should be "no broader than necessary to achieve its desired goals." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see also Nebraska Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) ("We have long held that an injunction must be narrowly tailored to remedy the specific harm shown.") (internal quotation marks omitted).  For that reason, the Court is constrained to order that plaintiff Diana be afforded the *nonrefoulement* interview to which she is entitled, rather than that she be returned to the United States for the pendency of the litigation.

## CONCLUSION

For all these reasons, plaintiffs' motion for preliminary injunction will be granted in part and denied in part.

A separate order will issue.



AMY BERMAN JACKSON
United States District Judge

DATE:  June 25, 2020

30